**Thomas M. WALSHE, III, M.D., Plaintiff, Appellant,**

v.

**Rear Admiral Wycliffe D. TOOLE, Jr., Commandant, First Naval District, et al., Defendants, Appellees.**

**No. 80–1735.**

United States Court of Appeals, First Circuit.

Argued May 6, 1981.

Decided Oct. 7, 1981.

Mitchell Benjoya, Boston, Mass., with whom Daniel D. Chaffee, Allison R. Porter, Ouida C. M. Young, and Denner & Benjoya, Boston, Mass., were on brief, for plaintiff, appellant.

Charles K. Mone, Asst. U.S. Atty., Boston, Mass., with whom Edward F. Harrington, U.S. Atty., Boston, Mass., was on brief, for defendants, appellees.

Before GIBSON,* Senior Circuit Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This appeal from the district court's denial of a petition for habeas corpus raises the question whether the U.S. Navy properly refused petitioner's application for discharge as a conscientious objector.

Petitioner, Thomas M. Walshe, M.D., joined the Naval Reserve under the "Berry Plan" late in 1972. By so doing he ensured that he would not be subject to draft and would be allowed to pursue and complete specialized medical training. Dr. Walshe became obligated, in return, to serve two years of active military duty upon completion of his residency. Walshe's residency in neurology at a prestigious Boston hospital ended in 1977. Early in May 1977, orders were sent directing him to report for active service in the Navy commencing on July 6, 1977. His orders indicated that he was assigned to the National Naval Medical Center in Bethesda, Maryland, a distinguished teaching hospital which Walshe had already visited and at which, in prior correspondence with Captain Brannan, Chief of

* Of the Eighth Circuit, sitting by designation.

Neurology, he had expressed an interest in serving.

Shortly after receiving his orders to active duty, Dr. Walshe applied for a hardship discharge from the Naval service and then for a discharge on grounds of conscientious objection.[1] At about the same time, Dr. Walshe brought a habeas corpus proceeding in the district court, requesting and securing injunctive relief against being called up until the Navy had passed on his hardship and C.O. requests.

Walshe's hardship request was rejected on June 20, 1977. Processing of the C.O. request got off to a rapid start, with prescribed interviews by a chaplain and psychiatrist, and a hearing before the Investigating Officer, all taking place in July 1977. However, it was not until spring of 1979 that the Investigating Officer issued his report—an unfavorable one—and January 11, 1980, that the Chief of Navy Personnel denied the claim. Walshe then amended his pending habeas petition to challenge the validity of the Navy's denial of the C.O. petition. (He did not contest denial of the hardship application.) He also secured further temporary relief against involuntary call-up, which relief continues in effect. The district court denied the habeas petition and this appeal followed.

## I.

Before turning to the principal issues in this appeal, a brief summary of Dr. Walshe's claimed basis for C.O. status is in order. He set these forth in an extensive written statement, and at a hearing before the Investigating Officer, Commander Dowling, on July 22, 1977. He stated that he opposed all war, and that his position rested on personal moral values "as a physician and christian," and involved, as a central component, the sanctity of human life. Dr. Walshe said he hoped to teach medicine as a career and that he had come to feel that direct involvement with an organization oriented towards widespread destruction and harm would be contrary to his most basic religious and ethical convictions. He explained that he had joined the Berry Plan before his beliefs had crystallized as an expedient to enable him to continue his medical training, and that while his present opposition to war was rooted in certain earlier experiences and in religious training and thought, which he outlined, it had coalesced only in the two years prior to 1977. The influence of his wife, a Moslem from Iran, and certain tragic events affecting his Iranian parents-in-law, who lived with him, one of whom had attempted to commit suicide in 1975 in reaction to the accidental death of a son, were cited as factors in the maturing of these beliefs. Dr. Walshe submitted letters from medical colleagues and family members attesting in a general manner to his character and pacifist views.

## II.

The Navy rejected Dr. Walshe's C.O. request because of an asserted lack of candor, sincerity and depth of conviction.[2] The Navy's determination of insincerity seems largely to have derived, in turn, from the Investigating Officer's findings that Dr. Walshe had deliberately withheld or misrepresented certain facts. It now appears, however, that the Investigating Officer was wrong as to these matters.

1. Department of Navy regulations provide that claims of conscientious objection by reservists such as Dr. Walshe are to be judged by the same SSS standards used in classifying draft registrants. 32 C.F.R. § 73.18(o). Such claims are limited to beliefs which became fixed after, rather than before, enlistment. *See* section 730.18(b)

2. Under Naval regulations, a conscientious objector is a person who "sincerely objects to participation of any kind in war in any form." 32 C.F.R. § 730.17(b)(1)(i). While such objec-

tion must be "by reason of religious training and belief," this phrase encompasses a "deeply held moral or ethical belief, to which all else is ultimately dependent." Section 730.17(b)(2). The belief "may be a sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by God in the usual sense, or, in the case of deeply held moral or ethical beliefs, a belief held with the strength and devotion of a traditional religious conviction."

At the outset of the presentation of his C.O. claim, in July 1977, Dr. Walshe seems to have made a favorable impression. The naval chaplain assigned to interview him reported himself impressed with Dr. Walshe's apparent honesty and sincerity; he recommended that C.O. status be granted. Dr. Walshe may also have made an initially favorable impression upon the Investigating Officer, Commander Dowling, who in his otherwise negative report rendered nearly two years later describes him as being "dignified," "well dressed, congenial and courteous." [3] During the hearing before Commander Dowling, Dr. Walshe emphasized (as he had when speaking to the chaplain, who found the point convincing) that his feelings against war were so strong that he "would rather forgo the privilege of working at the National Naval Medical Center [in Bethesda] than to participate at all in the Navy." The Bethesda assignment, he said, was "a very good job ... an excellent academic job. My interest is in academic medicine.... The neurology was good there, *and I chose to give that up because of these beliefs.*" (Emphasis supplied.) This assertion, impressive on its face, has come back to haunt Dr. Walshe both in the Navy's proceedings and in the district court. Dr. Walshe also told Commander Dowling that far from his C.O. claim being "expedient," "it is somewhat of a hardship for me to be without a job and be in limbo hanging here without being able to make plans...."

Whatever the effect of these remarks when made, they came under close and unfavorable scrutiny when, a few months later, Commander Dowling inadvertently learned that on the very day of the hearing Dr. Walshe had been employed at a Veter-

ans Administration hospital in Brockton, Massachusetts. Dr. Walshe had not himself revealed that fact, and Commander Dowling, remembering Walshe's statement that he was "without a job," felt that Walshe had consciously sought to mislead him in order to cover up the fact that he was doing work at variance with his professed scruples against military employment.[4] Commander Dowling also came across correspondence with Capt. Brannan, Chief of Neurology at Bethesda Hospital, in which shortly before February 1977 Dr. Walshe had written he was "looking forward" to Naval service at Bethesda. Walshe's letter in this regard had been followed by a letter from Brannan dated 11 February 1977 stating there was "little chance of an opening in our staff." On the basis of this exchange, Dowling seems to have felt that Walshe's conscientious beliefs could not have been present in the two years prior to July 1977 as represented, and also that Walshe may have lied when he spoke of giving up "a very good job at Bethesda" in order to pursue his C.O. status. The Investigating Officer either did not know, or else deemed it irrelevant, that notwithstanding Captain Brannan's pessimistic report in February 1977, Walshe was in fact ordered to Bethesda in the orders sent him in early May 1977. Moreover, since, as it now appears, Walshe's C.O. application was not submitted to the Navy until late May 1977, Walshe knew of this favorable assignment when he applied for C.O. status, and hence could honestly argue that he knowingly surrendered "a very good job" when he sought C.O. status.

On November 21, 1978, the Investigating Officer notified Walshe's attorney that he had information that Walshe, "notwith-

---

**3.** The lawyer who represented Dr. Walshe before the Investigating Officer stated in an affidavit filed in the district court that shortly after the hearing Commander Dowling told him "off the record" that Dr. Walshe was sincere and that he intended to recommend discharge.

**4.** The Chief of Naval Personnel, in his rejection of the C.O. application on 11 January 1980 (following issuance of the Investigating Officer's adverse report the previous April) said that it was well known that V.A. hospitals

served to relieve the fear and suffering of veterans wounded in battle and to allay the fears of active duty personnel that once disabled they might be abandoned. Walshe's willingness to serve in such hospitals was found inconsistent with his statement at the hearing that he could not help relieve the fear and suffering of military personnel since his beliefs prohibited him "from participating in and supporting, even by yea say, the concept that puts these people in pain and suffering."

standing his claimed objection to military service had accepted employment at two hospitals operated by the Veterans Administration and had expressed to the Navy a preference for duty assignment upon his anticipated call-up to active duty." From the tone of the officer's letter, as well as from the fact that he offered to reopen the hearing or receive written comments, it was plain he regarded these disclosures as unfavorable and highly significant. He ended his letter to Walshe's attorney by apologizing for the delay, but blaming Walshe for not having proffered "the 'new' information which obviously impacts critically on his application." Walshe's attorney did not respond to this communication, and, in the spring of 1979, the Investigating Officer issued and circulated his unfavorable report. In this he found that Walshe's desire not to serve was based more on matters of personal comfort than any deeply held religious, moral or ethical considerations. He noted Dr. Walshe's tendency invariably to describe the experiences underlying his change of belief in terms of his own family situation, and found no nexus between his claimed conscientious objection and deeply held ethical or moral belief. The Investigating Officer termed as "perjured" Dr. Walshe's testimony concerning his being "without a job"; this response was "elected," the Investigating Officer felt, "[i]n apparent recognition of the impediment with his then employment at the Veterans Administration hospital in Brockton would obviously be to his discharge request." Commander Dowling also discredited Dr. Walshe's claim of having been given by the Navy a good job at Bethesda. He concluded, "I find no credible support in the written or oral presentation of his case to support the suggestion implicit in that allegation that his application for discharge as a conscientious objector operated to his professional or economic detriment."

After issuance of the Investigating Officer's report, a copy was forwarded to Walshe's attorney with notification that Walshe had a right within five days to submit a written rebuttal. 32 C.F.R. (j)(10). No rebuttal, however, was forthcoming.

(In particular, Walshe never pointed out, as he might have done, that contrary to the strong implication in Commander Dowling's report, Dr. Walshe *had* received orders to Bethesda before he applied for C.O. status, thus rebutting the suggestion that he had lied when asserting that he had given up a good assignment.)

Nine months later the Chief of Naval Personnel issued his own report, dated 11 January 1980, listing two reasons for rejecting the request: (1) Walshe's allegedly inconsistent employment with the Veterans Administration hospitals; and (2) the lack of any reasonable connection between the events giving rise to Walshe's beliefs—marriage to a Moslem, death of brother-in-law and mother-in-law's attempted suicide—and Walshe's professed opposition to war in any form.

Walshe was reordered to duty following the turndown of his application in 1980. This ended the quiescence of his attorneys, who secured a further injunction and pursued an amended petition for habeas corpus. The amended petition unfortunately carried forward an earlier error alleging that Walshe's C.O. petition had been filed on 30 April 1977 rather than late in May 1977 as was in fact the case. This error tended to support the district court's later expressed but erroneous view that when Walshe applied for C.O. status, he must still have believed there was no vacancy at Bethesda (Walshe's orders to Bethesda were not forwarded to him until sometime after May 4, 1977).

In any case, the district court heard the amended habeas corpus petition in September 1980, issuing its memorandum and order a few days thereafter. The district court stated that it had "no doubt that there is a substantial basis in fact for the denial of this application," noting that in February 1977 Walshe had been enthusiastically looking forward to service in the Bethesda hospital even though the events which allegedly altered his beliefs had occurred in 1975. The court continued,

It was only after being informed that he could not get his desired billet at the Bethesda National Naval Medical Center that his enthusiasm changed to conscientious objection. . . . Plaintiff did not tell the truth when he said that he gave up a favorable assignment at Bethesda because of his beliefs, because in fact he' never received such an assignment, nor was he likely to.

While the court thus approved of the Navy's action, it was concerned by the fact that the Chief of Naval Personnel had placed heavy reliance for rejecting Walshe's claim on what, in its view, was a *non sequitur*—namely that Walshe was working at a V.A. hospital. As the court properly noted,

Veterans hospitals do not provide support for people actually engaged in war or preparation therefor. Service with such a hospital may fairly be distinguished from naval service, even given the breadth of plaintiffs' asserted conscientious objection. Employment in Veterans Administration Hospitals has been a common alternative service for conscientious objectors.

Citing to *Goldstein v. Middendorf*, 535 F.2d 1339, 1345 (1st Cir. 1976), the court concluded that the case should be remanded for reconsideration by the Chief of Naval Personnel, who was to exclude from his reconsideration Walshe's employment by the V.A. and his failure to reveal that fact. The court felt, however, that further review by the Investigating Officer was not needed, particularly since the latter had indicated he would reach the same result even without evidence of V.A. employment.

While the district court's conclusion that Walshe's C.O. application had been triggered by failure to get a sought-for appointment at Bethesda was hardly new—the Investigating Officer had intimated this in his report, and the Assistant U.S. Attorney argued it briefly at the hearing before the district court—Walshe reacted to this damaging charge only after the district court issued its memorandum and order of September 24, 1980. On October 5, 1980, Walshe moved in the district court for reconsideration, attaching a copy of his orders to Bethesda and other supporting material. This motion was denied by the court on the ground that "at the time of his application for C.O. discharge plaintiff had been informed that he would not receive the desired billet at Bethesda NNMC." Walshe then filed a second motion for reconsideration, demonstrating convincingly that, contrary to his own allegations in the habeas petitions, his undated C.O. application had in fact been filed late in May 1977 (the Navy now concedes this). Since the orders to Bethesda went out in early May, Walshe obviously knew of that assignment when he sought C.O. status. By the time this second motion was filed, the Chief of Naval Personnel had responded to the court's remand by once again denying Walshe's application.[5] The court denied the second motion stating that the Navy had had "an opportunity to review its decision and that is sufficient. Furthermore it was incumbent on the plaintiff to put all his case in at once, not in dribbles or successive motions for reconsideration."

### III.

We have stated the factual and procedural history at length since these are critical to the two questions before us, namely (1) whether the district court's judgment upholding the Navy can stand; (2) if not, what relief to order.

---

5. The Navy's second denial, following remand, was dated October 16, 1980. It rested on a finding of (1) lack of sincerity, and (2) Walshe's failure to establish by clear and convincing evidence any sound religious, ethical or moral basis for his C.O. claim.

In support of (1), the Navy listed (a) late filing of the C.O. application (although Walshe's beliefs had allegedly crystallized by mid-1975, he did not claim C.O. status until one month before he was due to report); (b) the parallel filing of the hardship application, and the underlying nature of the personal and traumatic experiences which predicated the dual petitions, all suggesting that personal hardship was the real explanation for his desire for release; (c) the Investigating Officer's opportunity to observe Walshe's demeanor and judge sincerity or lack thereof. In support of (2) the Navy emphasized the Investigating Officer's findings that Walshe's motives were "indistinguishably selfish and transparently pragmatic."

As to the first question, we think the judgment below cannot stand. The district court rightly recognized that the Navy incorrectly rested its initial decision on the fact that Dr. Walshe had gone to work at two V.A. hospitals while at the same time seeking a C.O. discharge. The Navy has not appealed from this ruling and we need say no more about it. However, the district court erred in finding that Dr. Walshe had not told "the truth when he said that he gave up a favorable assignment at Bethesda because of his beliefs, because in fact he never received such an assignment, nor was he likely to." On the record then before the district court this was a reasonable surmise, but, as we now know from materials set out in the motions for reconsideration, and as the Navy concedes, it was simply incorrect. This factual error, coupled with the court's related statement that it had "no doubt that there is a substantial basis in fact for the denial of this application," made it difficult, if not impossible, for the Chief of Naval Personnel to review the matter objectively on remand. While the opinion on remand did not mention that particular point, it would be unrealistic to expect the Navy to have accepted Walshe's C.O. claim in the face of the court's assertions both that Dr. Walshe had deliberately lied about the matter and that this furnished a substantial basis in fact for denial of his claim.

Moreover, the Navy's own opinion on remand is tainted by its heavy reliance on the Investigating Officer's unfavorable assessment of Walshe's credibility—an assessment which was itself tainted by two serious, underlying errors: (1) the officer's mistaken belief that work with the V.A. demonstrated a lack of sincerity in the C.O. claim; and (2) his belief that Walshe was lying when he said that he had given up a very good job at Bethesda. While the Investigating Officer wrote, in passing, that he would have reached the same disposition absent the information garnered after the close of the hearing, we are unable to give credence to this remark. The tone of the Investigating Officer's report is to the effect that Walshe was a perjurer with "transparently selfish" motives—a characterization only explained by the officer's reaction to the later found materials. The chaplain had given Walshe a favorable assessment, and Walshe's statement of beliefs was coherent and well expressed. The Investigating Officer, and later the Chief of Naval Personnel, plainly felt that the V.A. matter was critical on the issue of sincerity; and the district court itself believed that the Bethesda job was so crucial as to be dispositive. We accordingly do not believe that the Navy's October 1980 decision after remand, resting as it does, to a significant degree, on the Investigating Officer's tainted demeanor and credibility assessments, can stand. *See Goldstein v. Middendorf*, 535 F.2d at 1344–45.

The final question is what disposition to make of Walshe's habeas proceeding. Walshe argues strongly that the Navy's inordinate delay in deciding his case requires that habeas corpus be granted relieving him from his Naval obligation. We agree that the Investigating Officer took much too long to reach a decision, even assuming that he was justified in looking into the question of Dr. Walshe's employment by the V.A. But blame for the present confusion and delay does not rest solely with the Navy. The Investigating Officer, slow though he was, took pains to notify Walshe's attorney of his concern both about the V.A. issue and about the fact that Walshe had been expressing interest in a Bethesda assignment very shortly before he applied for C.O. status. Not only did Walshe not respond then, he filed no rebuttal to the Investigating Officer's report when issued although both Naval regulations and the Investigating Officer's letter of transmittal invited him to do so. That report revealed the factual misconception about the Bethesda job which later so confused the district court. Dr. Walshe was in a position to know when he filed his application for C.O. discharge, when he received his orders, and what he knew when he applied. These were the sort of basic factual issues that could and should have been straightened out administratively. Much of the confusion which has char-

acterized this case could have been avoided had Walshe demonstrated the same activity at the administrative level he has shown in court. Indeed, Walshe contributed to this error by giving the wrong date for filing the undated C.O. application in both his original and amended habeas petitions.

We believe the appropriate relief in these circumstances is to remand to the Navy, giving it the option either to discharge Dr. Walshe now if it desires on the basis of the present record and this opinion, or else to conduct further proceedings on an expedited basis. Since the errors we have noted infected the Investigating Officer's report, the Navy—unless now willing to discharge Dr. Walshe—should appoint another Investigating Officer who will hold a new hearing on his application for C.O. status. This will permit the making of a credibility determination totally removed from the errors and any presuppositions infecting the former proceeding.

Because of the Navy's previous delays, we think it reasonable that if the Navy wishes to proceed further it be required to complete the new Investigating Officer's hearing and report, and issue a final determination by the Chief of Naval Personnel concerning Dr. Walshe's claim, within 60 days from the date that the district court enters a judgment pursuant to this opinion.

We accordingly vacate the judgment below and direct that this matter be remanded to the district court where a new judgment shall be entered requiring the Navy either to discharge Dr. Walshe forthwith or else to conduct new administrative proceedings, including a new investigation and hearing by a different Investigating Officer,[6] within a period not to exceed 60 days after entry of the district court's judgment. If such new proceedings are not concluded, and a final administrative decision entered within said 60 day period, the writ of habeas corpus is to issue and Dr. Walshe is to be discharged from the Naval Reserve.

*So ordered.*

6. We see no reason for a new chaplain's or psychiatrist's interview, there being no ques-

tion as to the fairness or adequacy of these.