# United States Court of Appeals

## For the First Circuit

No. 07-1090

MARY HANNA, M.D.,

Petitioner, Appellee,

v.

SECRETARY OF THE ARMY and COMMANDER, 94th REGIONAL READINESS
COMMAND, FORT DEVENS, MASSACHUSETTS,

Respondents, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Boudin, Chief Judge,

Torruella, Circuit Judge,

and Schwarzer,[*] District Judge.

Mark T. Quinlivan, Assistant United States Attorney, with
whom Anita Johnson, Assistant U.S. Attorney, and Michael J.
Sullivan, United States Attorney were on brief, for appellant.
Louis P. Font, with whom Gale L. Glazer and Font & Glazer
were on brief, for appellees.

January 9, 2008

---

[*]Of the Northern District of California, sitting by
designation.

**Schwarzer, District Judge**. Captain Mary Hanna sought discharge from the Army as a conscientious objector. The Department of the Army Conscientious Objector Review Board ("DACORB") denied Hanna's application. Hanna then petitioned the district court for a writ of habeas corpus which the court granted, holding that there was no basis in fact for the DACORB's decision. Hanna v. Sec'y of the U.S. Army, 2006 WL 2925268 (D. Mass. Oct. 6, 2006). The Army appealed. We hold that the DACORB's decision was without a basis in fact, and we therefore affirm.

### FACTUAL AND PROCEDURAL HISTORY

Mary Hanna joined the Army in 1997 as a member of the Army Health Professions Scholarship Program ("HPSP") and thereafter attended medical school. In exchange for financial assistance with medical school, Hanna promised to serve on active duty in the Army for four years and to remain in the Army Reserve for an additional four years. After Hanna finished medical school, the Army deferred her active duty obligation for four years while she completed a residency in anesthesiology. On October 20, 2005, the Army sent Hanna a letter directing her to report for active duty in August 2006. Hanna was later scheduled to report to William Beaumont Army Medical Center in El Paso, Texas.

On December 23, 2005, Hanna filed an application for discharge as a conscientious objector ("CO"). In her application, Hanna declared that she sought discharge because, as a Christian,

-2-

she believed in the inherent sanctity of human life and that it "would be committing a crime against God" to take another human's life. She further explained:

> I . . . believe that violence and killing are in direct contradiction to all of Jesus' teachings. I am unable to put Christ's words into practice while simultaneously participating, whether directly or indirectly, in war, violence, and killing. All of Jesus' preaching reiterates love, peace, forgiveness and cautions against anger, hatred, and their end product, murder. Based on Christ's example, I believe that I must take things one step further and constantly strive to eliminate conflict with others by seeking prompt reconciliation with adversaries. Love of God and love of fellow humans drives Christian life, and I have incorporated this principle into my own life.

Hanna declared that she would be "incapable of attaining these qualities" by participating in "war and killing" and would "betray these moral and religious principles by participating in war in any way." She explained that her parents were "deeply involved" in the Coptic Orthodox Church ("COC") and that her father had planned to become a monk and her mother a nun until they met each other and chose to marry. As a child, Hanna attended church weekly in Los Angeles, where she grew up. Her parents taught her to believe in "love for God first, love for all other humans as a direct reflection of our love for God, respect for elders, respect for the traditions of our Church, honesty, sincerity of heart, and constant striving for goodness." Hanna became a Coptic hymn

teacher in high school and later served as a Sunday school teacher while she attended UCLA. She also participated in the Coptic Club at UCLA.

In 1997, in her senior year of college, Hanna applied and was accepted for medical school at Tufts University. In her CO application, Hanna described her last year of college as a time that "greatly tested" her faith and her "proximity to the Church." At the time she applied for the HPSP, Hanna was experiencing a period of "change and uncertainty" during which she "questioned everything." She "turned to atheism for several months, followed by agnosticism for several more months." During this time, she had "no particular convictions one way or the other regarding war."

Hanna's father died in 2003, and during the mourning period that followed his death, Hanna's faith was "rekindled" and she found herself "again drawn to God." She explained that "I had lived both without God and with him, and I liked myself immensely more when striving to emulate his nature, his mercy, his love, his generosity, his forgiveness." Hanna further explained that it "took some time" for her to "make the connection between this newly rekindled faith and its incompatibility with certain aspects" of her life. For example, she became increasingly concerned about her participation in elective abortions as an anesthesiology resident because she felt she was "participating in an act in direct contradiction to the Bible's teachings." She asked her floor

-4-

manager if she could abstain from abortion procedures and her request was granted.

During the summer of 2005, Hanna watched several war documentaries and "growingly began to view all war from a Christian perspective: complete separation from God." She explained that she "started to gradually understand the spectrum Christ described which connects anger to hatred to violence to murder (war on a larger scale)." After watching the documentaries, she "finally understood how Christ equated them all as the same sin, with anger being the stem." Her new understanding motivated her to participate in a war protest in September 2005, where she realized that she "was no longer able to play a role in propagating violence." In early October 2005, Hanna watched a television program during which a man discussed the "destructive role" of war and violence, citing the Beatitudes. She then realized that "to live the rest of my life with integrity, in harmony with God's nature of love and compassion, I could not participate in military service." Reflecting on her choice to join the Army, Hanna commented, "I realized then the full implications of the path I had chosen years earlier and the incompatibility of war and violence with Christ's teachings."

Hanna submitted six letters in support of her CO application, four from Coptic Orthodox priests who knew her personally, and two from supervisors in her residency program. One

of the priests, who had known Hanna since infancy, stated that he had spoken with Hanna recently about her belief that war is "the direct opposite of Christ's call to peace and love." The priest wrote:

> I have read her application for conscientious objector status, and it is consistent with her character, ethics, and approach to Christianity. I know Mary well, and she is both honest and sincere in her application. I strongly urge you to approve her application in order to allow her to live a life that does not contradict her beliefs.

A second priest, who had known Hanna for more than 15 years, wrote that Hanna was "both honest and sincere in her application," that he knew Hanna well, and that she was "trying to live a life consistent with her beliefs." He urged the Army to approve her application. A third priest, who had known Hanna for 12 years, described her as "one of the most dedicated conscientious and compassionate young ladies in our church." He described her as "trustworthy, honest and sincere." A fourth priest wrote that Hanna had been a member of St. Mark Coptic Orthodox Church in Natick, Massachusetts since 1997. Hanna attended church there regularly during medical school and as often as her call schedule allowed during her residency. Hanna's supervisors wrote that her CO application was "a sincere representation of who she is, and what she believes," described Hanna as "a gentle soul" and "'the mother to all our sickest patients'" and urged the Army to approve

-6-

her application.

After Hanna submitted her application for discharge, Colonel John Powers in the Office of the Surgeon General issued a memorandum regarding her application. Powers commented that "[t]he Army is under-strength in anesthesiologists."[1] Turning to Hanna's application, he noted that he "did not question [Hanna's] religious belief" but that he found "some aspects" of her application "troubling." Powers stated that although Hanna stated in her CO application that she was experiencing doubts about her religious faith at the time she applied to the Army, her 1997 HPSP application indicated that she had been teaching Sunday school during the same time period. Powers also noted the late timing of Hanna's CO application, commenting that she never raised concerns about conscientious objection during medical school or her residency. Powers observed that Hanna's application was received around the same time as a CO application submitted by another anesthesiologist and shortly after the Army approved the CO application of a third anesthesiologist. He pointed out that all three applicants were represented by the same attorney. Powers

---

[1] In a declaration in support of the Army's opposition to Hanna's petition for preliminary injunction in the district court, the Program Manager for Graduate Medical Education in the Office of the Surgeon General stated that "[t]he United States Army is critically short of Anesthesiologists. The Army currently only has 75 of the 95 required fully qualified anesthesiologists. That means that only 79 percent of the necessary Anesthesiologists are on staff at Army medical treatment facilities."

also commented that the Army had paid more than $180,000 for Hanna's medical school expenses. He recommended that the Army either deny Hanna's application and order her to active duty, or grant the application with recoupment of her medical school costs plus interest.

Pursuant to Army regulations, Hanna was interviewed by a military chaplain and a psychiatrist. The chaplain's report stated that the Coptic Orthodox Church does not teach pacifism. He reported that, based on his research, he believed the COC "endorses military service through the example of [its] Saints and religious leaders." The chaplain also questioned Hanna's sincerity because she worked in a hospital that provided abortions. He added that Hanna had not made significant lifestyle changes since becoming a conscientious objector.

The psychiatrist found that Hanna did not suffer from any psychiatric disorders. He also found that Hanna's application was "a convenient, if not opportunistic choice in refuting her basic military contract based on her newly found faith." During her interview with the psychiatrist, Hanna related that her father had served in the Egyptian military for six years and was very proud of her decision to join the Army. She told him that her father would have been "devastated" to know of her decision to file for discharge as a conscientious objector. Hanna also told him that she was prepared to repay the Army for her medical school costs

plus interest.

Hanna's application was assigned to an Investigating Officer ("IO"). The IO conducted a hearing lasting more than six hours at which he heard testimony from Hanna, two Coptic Orthodox priests who knew Hanna personally, and the Army psychiatrist who had interviewed Hanna. One of the priests, who had known Hanna for six years, testified that she was "an honest and sincere person" and that her application accurately described the source of her beliefs. The priest also testified that there is no uniform position on military service in the Coptic Orthodox Church. Rather, the Church supports both conscientious objectors and those who choose military service. The priest disagreed with the chaplain's conclusion that the COC endorses military service and also with the chaplain's statement that some COC saints were "warriors." He testified that military service by these saints occurred before their religious phase. The second priest, who had known Hanna since she was seven or eight years old, testified that she is a "truthful person" and that he supported her CO application. He also testified that the COC supports both conscientious objectors and those who serve in the military. The IO credited the testimony of both priests.

In his summary of Hanna's testimony, the IO stated that when Hanna applied to the HPSP in 1997, "she was naive and her personal belief system was not fully developed. She did not give

much thought to the morality of war." During college, "her religious faith waxed and waned" and she "began to question her religious beliefs" and this "caused discord with her father." When she watched the war documentaries in 2005, she was "'shocked'" by the civilian deaths. After watching the movies, she "adopted a pacifist approach. She began praying more. She read scripture and the writings of religious philosophers. She noted that Jesus Christ was a pacifist." Hanna testified that by treating soldiers, "she would be repleting the force and assisting it [in] waging war." She stated that her objection to war was based on her "religious upbringing, her personal belief system and Christian theology."

Hanna further testified that there was a distinction between serving in the Army and working at a civilian hospital that provides abortions. Hanna reasoned that a civilian hospital is "not an organization that is dedicated to war." By treating soldiers, she would be assisting the Army to wage war, whereas at a civilian hospital, she had the option to refrain from participating in abortions. She stated that she had "no offer or prospects for private practice" if her CO application was granted.

In addition to hearing the testimony of witnesses, the IO reviewed Hanna's CO application, her 1997 HPSP application, the reports of the chaplain and psychiatrist, the Powers memorandum and attached documents, the letters of support from Coptic clergy

members and Hanna's professional supervisors, and various research materials related to Eastern Orthodox churches.

The IO concluded that Hanna sincerely opposed participation in war in any form because of her religious, moral and ethical beliefs. In his report, the IO observed that Hanna was "open, cooperative, courteous and sincere during the hearing." He concluded that she was

> sincere and very credible . . . I was impressed by CPT Hanna's sincere expressions of her beliefs and her interaction with Father Bishara (in person) and Father Henein (by telephone) at the hearing. I was left with the impression that she was a devout member of the COC and sincerely held the beliefs she professed in her CO application.

The IO found that Hanna's objection to war became fixed in 2005. He credited Hanna's testimony that "when she applied to join the military in 1997 her belief system was still developing and, in fact, she was experiencing doubts as to the existence of God." He also credited her explanation of how her beliefs developed from the death of her father in 2003 through the summer and fall of 2005, when she began to view war from "a Christian perspective." The IO concluded his report by stating:

> I assessed [Hanna's] credibility at the hearing and considered the opinions as to her sincerity and/or honesty proffered by Fathers Bishara and Henein, Philip Hess, M.D., Father Megally, and Stephanie Jones, M.D. I concluded that CPT Hanna is an honest and truthful person and credited her statements that her beliefs became incompatible with military service in October 2005.

-11-

The IO also discussed the reports of the chaplain and the psychiatrist, as well as the Powers memorandum. The IO concluded that the chaplain was incorrect in his opinion that the COC is not supportive of conscientious objectors. He noted that two Coptic priests had testified that the COC supports conscientious objectors, and that this testimony was consistent with materials he reviewed regarding the treatment of war by Eastern Orthodox religions. The IO also noted that, under Army regulations, an applicant's personal convictions dominate over the teachings of her church, "so long as they derive from the person's moral, ethical, or religious beliefs." The IO found that

> [i]n addition to her involvement with the COC, CPT Hanna made reference to her personal research into Christian philosophy and the development of her own, individual beliefs as to God and morality and her personal moral belief system. I find that in the case of CPT Hanna, her opposition to war in all forms is derived from moral, ethical and religious beliefs and that her beliefs are sincerely held.

Regarding the chaplain's views on Hanna's work at a hospital that provides abortions, the IO credited Hanna's explanation that serving in the military is not analogous to working in a civilian hospital. The IO concluded that Hanna's work at a hospital that provides abortions and her willingness to treat police officers and gang members had no bearing on the sincerity of her objection to war.

Turning to the Powers memorandum, the IO credited Hanna's testimony that she did not know the other anesthesiologists who had submitted CO applications. The IO also commented that no adverse inference could be drawn from the fact that Hanna had hired an attorney experienced in CO applications because a prudent person would not pay attorney's fees to someone who did not have the requisite experience to provide effective representation. The IO further noted that Hanna's attorney was a West Point graduate, that he had served on active duty, and that he had previously represented numerous soldiers who were seeking to be retained by the Army.

Regarding the psychiatrist's report, the IO stated that the psychiatrist admitted during testimony that his report contained several errors, including an incorrect characterization of Hanna's beliefs as "not based on any religious conviction." In his testimony, the psychiatrist clarified his opinion that "while CPT Hanna's beliefs were not anchored in the tenets of a particular religion they were a product of her personal faith system." The IO commented that he interpreted the psychiatrist's testimony to mean that Hanna's beliefs were a product of "her personal relationship with God." The IO also noted that the Powers memorandum, which the psychiatrist reviewed before Hanna's interview, may have prompted the psychiatrist to "engage in an unnecessarily involved discussion" of the issues in the memo, particularly her choice of

attorney, putting Hanna "on the defensive" and possibly influencing Hanna's demeanor during the interview, which the psychiatrist reported as tense and guarded. The IO found that, in contrast, Hanna's demeanor during the hearing was "open, cooperative, courteous and sincere."

The IO's report was forwarded to officers up the chain of command, each of whom recommended approval of Hanna's application based on their findings that Hanna sincerely opposed participation in war because of her religious beliefs. Colonel Robert Marsh found that Hanna's "life-long church involvement does not appear to be a recent effort to avoid military service." Colonel Marsh further stated that "[t]he strength and intensity of her evolving convictions against war and violence, beginning with the death of her father in May 2003 and becoming firm by October 2005, are reflective of sincere belief and are supported by clear and convincing evidence." A Staff Judge Advocate ("SJA") recommended approval after concluding that "[t]he investigating officer conducted a thorough inquiry into [Hanna's] convictions. Numerous witnesses were called on her behalf." The SJA noted that after the death of her father, Hanna "felt free to consider the contradiction in her religious beliefs and the Army mission." The SJA further commented that Hanna's application "is not a means to avoid her military commitment." Brigadier General Todd Semonite found, after "thoroughly" reviewing the file, that Hanna's objection was

"sincerely held" and that "[t]he solemnity of her convictions is clear throughout the investigation and they do not appear to have been born of a desire to avoid service." General Semonite emphasized that his conclusion was based on "the investigating officer's credibility determination, CPT Hanna's testimony, and the opinions of the leaders of her church."

Hanna's application was ultimately reviewed by the DACORB, which voted 2-1 to reject it. The President of the Board voted to disapprove the application, stating:

> Applicant has shown that she is a devout Coptic Christian but has failed to show that she sincerely meets the CO criteria. Her statements are logical but lack passion and sincerity; they appear as repetition rather than personally held beliefs.

The Chaplain voted to disapprove the application, stating:

> The statement by the priest that the COC does not teach pacifism leads one to believe that there is more to Cpt. Hanna's position then merely religious conviction. Also, her timing is too convenient w/the completion of her schooling and her entry on [active duty].

The Staff Judge Advocate voted to approve the application, finding that the applicant "has a firm, fixed and sincere objection to participation in war in any form."

Hanna petitioned for a writ of habeas corpus. The district court, after a lengthy and detailed review of the record, held that there was no "basis in fact" for the DACORB's decision and

granted Hanna's petition permanently enjoining the Army from ordering Hanna to active duty.[2]

The Army timely appealed.

**DISCUSSION**

## I. STANDARD OF REVIEW

We review a district court's grant or denial of habeas de novo. Healy v. Spencer, 453 F.3d 21, 25 (1st Cir. 2006). Our review of conscientious objector claims turns on whether a "basis in fact" exists for the military's decision. Bates v. Commander, First Coast Guard District, 413 F.2d 475, 477 (1st Cir. 1969) (citing Estep v. United States, 327 U.S. 114 (1946)); Lobis v. Sec'y of the United States Air Force, 519 F.2d 304, 306 (1st Cir. 1975). Denial of an application "will be upheld on review if there is a 'basis in fact' for the decision." Hager v. Sec'y of the Air Force, 938 F.2d 1449, 1454 (1st Cir. 1991). "Although this standard of review is a narrow one, it is not toothless. A basis in fact will not find support in mere disbelief or surmise as to the applicant's motivation. Rather, the government must show some hard, reliable,

---

[2] No First Circuit cases reviewing denial of conscientious objector status have ever reversed the district court's grant of a writ of habeas corpus. See Hager v. Sec'y of the Air Force, 938 F.2d 1449 (1st Cir. 1991); Walshe v. Toole, 663 F.2d 320 (1st Cir. 1981); Goldstein v. Middendorf, 535 F.2d 1339 (1st Cir. 1976); Lobis v. Sec'y of the United States Air Force, 519 F.2d 304 (1st Cir. 1975); Armstrong v. Laird, 456 F.2d 521 (1st Cir. 1972); Crotty v. Kelly, 443 F.2d 214 (1st Cir. 1972); Silberberg v. Willis, 420 F.2d 662 (1st Cir. 1970); Bates v. Commander, First Coast Guard District, 413 F.2d 475 (1st Cir. 1969).

-16-

provable facts which would provide a basis for disbelieving the applicant's sincerity, or it must show something concrete in the record which substantially blurs the picture painted by the applicant." Id. The DACORB's reasons for its decision "must be grounded in logic" and "'a mere suspicion is an inadequate basis in fact.'" Id.[3]

## II. WHETHER THERE WAS A BASIS IN FACT FOR THE DACORB'S DECISION

The Army's attack on the district court's decision is narrowly focused. It argues first that the timing of her application casts doubt on her sincerity and that her explanations for the change in her beliefs were inconsistent. Second, it argues that her beliefs were not gained through rigorous training, study or contemplation. We address each of those contentions in turn.[4]

---

[3] An applicant for discharge based on conscientious objection must show that: (1) she is conscientiously opposed to participation in war in any form; (2) her opposition is founded on religious training and beliefs; and (3) her position is sincere and deeply held. Hager, 954 F.2d at 1454; 32 C.F.R. § 75.5(a). The relevant regulation was removed from the Code of Federal Regulations and added to the Department of Defense Instructions effective June 19, 2007. See 722 Fed. Reg. 33677-01 (June 19, 2007). The substance of the regulation remains unchanged. This opinion will use the former Code of Federal Regulations citation.

[4] The dissent cites the adverse recommendations of the Army psychiatrist and the chaplain. However, the Army in its reply brief specifically stated that it did not rely on the views expressed by the chaplain, conceding that the chaplain's evaluation of Hanna's sincerity was improperly influenced by his "personal moral views." See AR 600-43 ¶ 1-5.b; 32 C.F.R. § 75.5(c)(iii) (interviewer may not "deny the existence of [the applicant's] beliefs simply because those beliefs are incompatible with [his] own."); Goldstein v. Middendorf, 535 F.2d 1339, 1344 (1st Cir. 1976) (military may not reject application because investigating

-17-

A. The Army's first argument is that the late crystallization of Hanna's opposition to war coupled with inconsistencies in her explanations for the change in her beliefs provide a "basis in fact" for the decision.

The Army concedes, as it must, that "[t]he timing of [an] application alone . . . is never enough to furnish a basis in fact to support a disapproval." AR 600-43 ¶ 1-5.b. See also Hager, 938 F.2d at 1455 ("It is universally the law . . . that late crystallization of conscientious objector convictions is not a sufficient basis in fact to reject the claim."). A sincere conscientious objector is entitled to release from his service obligations whether his view crystallizes late or early. Lobis, 519 F.3d at 307 (citing Ehlert v. United States, 402 U.S. 99, 103-04 (1971)). "If decisive weight could be given to timing, there would be nothing to prevent the services from indulging an absolute presumption against late crystallization . . . ." Id.[5]

In an effort to fortify its timing argument, the Army points to what it regards as inconsistencies in Hanna's explanation as

officer believes applicant's views on abortion are incompatible with conscientious objection). The Army further stated that it did not rely on the psychiatrist's report in this appeal. See AR 600-43 ¶ 2-3.b ("The psychiatrist or medical officer will make no recommendation for approval or disapproval of the application.")

[5] The dissent argues that "[t]here is nothing wrong with the board's concern with the timing of Hanna's application," failing to acknowledge that late timing is never a sufficient basis by itself for rejecting a claim of conscientious objection.

-18-

evidence of insincerity. In her CO application, Hanna stated that in 1997, when she applied for the HPSP scholarship, she was experiencing a period of "change and uncertainty" that "greatly tested [her] faith and [her] proximity to the Church." She further stated that during this time, she "questioned everything," turning to atheism for several months, followed by agnosticism. The Army contrasts this description with her 1997 application, in which Hanna described her activities and achievements as an undergraduate and expressed a desire to "take on the myriad challenges" of serving in the Army and practicing medicine. The Army argues that Hanna's 1997 motivation statement, which reflects Hanna's high-achieving, driven nature and her ability to "overcome obstacles in her life" based on her "strength and determination" is inconsistent with the statement in her CO application that she applied for the HPSP scholarship during a time of "change and uncertainty." The Army argues that the DACORB could have found Hanna's explanations to be inconsistent and hence evidence of insincerity.

The first response to this argument is that it rests on pure speculation. Nothing in the DACORB decision suggests that any DACORB member had found Hanna's explanations to be inconsistent. The statements of the President and the Chaplain are sufficiently specific that had they found Hanna to be insincere on the basis of inconsistencies in her explanations, one would have expected one or

-19-

the other to have said so.[6]  Moreover, the Army's after-the-fact interpretive gloss on Hanna's statements cannot pass muster as "hard, reliable provable facts which would provide a basis for disbelieving the applicant's sincerity . . . something concrete in the record."  Hager, 932 F.2d at 1454; cf. Koh v. Secretary of the Air Force, 719 F.2d 1384 (9th Cir. 1983)(finding of insincerity was supported by basis in fact where applicant, who had submitted her application one month after receiving active duty orders, had made two previous applications for discharge based on grounds other than opposition to war and had enrolled in a medical training program conflicting with her military commitment).

In any event, we do not find Hanna's explanations to be inconsistent.  That Hanna might have questioned her religious beliefs at the time when she applied for the HPSP is not inconsistent with her being highly motivated to attend medical school and join the military during that same period.  The IO credited Hanna's testimony that her "personal belief system was not

_____

[6] Army Regulation 600-43 part 2-8.d(3) provides: "If a determination [sic, is made] by HQDA that the person's request is disapproved, the reasons for this decision will be made a part of the record."  The denial of an application must be supported by a statement of reasons.  Hager, 938 F.2d at 1454.  "[A] court, if it sustains a decision by recourse to reasons outside those specified, opens the door to an improper substituting of the court's judgment and evaluation of evidence in place of that of the agency (here the CORB) or official with responsibility.  The court's judgment, its reasons and approaches, may not be acceptable to and may even have been discredited by the administrative officials responsible."  Checkman v. Laird, 469 F.2d 773, 781 (2d Cir. 1972).

-20-

fully developed" and that she had "not give[n] much thought to the morality of war" at the time she applied to the HPSP. As the IO noted, eight years had passed between Hanna's application to join the Army and her application for discharge. We think that was more than sufficient time for crystallization. See Lobis, 519 F.2d at 306 n.1.

Here, as in Lobis, "the [Army] has blotted out entirely the finding of sincerity made by its own Investigating Officer." 519 F.2d at 307. After conducting a hearing at which he heard testimony from Hanna and other witnesses and examined documentary evidence, the IO "concluded that CPT. Hanna is an honest and truthful person and credited her statements that her beliefs became incompatible with military service in October 2005." He found Hanna "to be sincere and her beliefs to be sincerely held." When the IO's recommendation was forwarded to the officers in the chain of command, it was endorsed at each level. At the first level, the commanding officer of the human resources command found that Hanna "has provided clear and convincing evidence supporting her request for conscientious objector (CO) status and discharge." The staff judge advocate found that "the evidence supports the findings of the investigating officer." Finally, the commanding general, in his recommendation to the DACORB, stated that Hanna "has put forth clear and convincing evidence that she is opposed to participation in war in any form based on her religious, moral and ethical beliefs."

-21-

Where, as here, the applicant has established her sincerity to the satisfaction of the officer charged with investigating her application and has provided a plausible explanation for the late crystallization of her beliefs, "inferences of insincerity drawn from the timing of the application are insufficient 'objective facts' to provide a basis-in-fact for rejecting the claim." Lobis, 519 F.2d at 309.

B.  The Army's second argument in support of the DACORB's decision is that Hanna's application does not comply with Army regulations.  Citing the regulations, it argues that Hanna's beliefs were not gained through rigorous training, study or contemplation. Instead, it points out, according to her application, her beliefs crystallized in October 2005 when she watched war documentaries and a television program discussing war and violence and their destructive roles.  Thus, she has failed to show that her beliefs were developed through "activity comparable in rigor and dedication to the processes by which traditional religious convictions are formulated."  32 C.F.R. § 75.5(c)(2)(ii).

This argument too is an after-the-fact rationalization which finds no support in the DACORB decision or in the record.  In any event, it lacks merit.

The regulation on which the Army relies states:

(ii) Relevant factors to be considered in determining an applicant's claim of conscientious objection include: Training in the home and church; general demeanor and pattern of conduct;

-22-

> participation in religious activities; <u>whether ethical or moral convictions were gained through training, study, contemplation, or other activity comparable in rigor and dedication to the processes by which traditional religious convictions are formulated</u>; credibility of the applicant; and credibility of persons supporting the claim.

32 C.F.R. § 75.5(c)(2)(ii)(emphasis added).

The Army's argument misreads its regulation. The reference to "rigor and dedication" appears in the context of comparing "traditional religious convictions" with "ethical or moral convictions." The "rigor and dedication" consideration applies only to applicants whose objections stem purely from secular beliefs, i.e. ethical and moral convictions, as opposed to those whose objections are based on "traditional religious conviction." <u>See</u> <u>Welsh</u> v. <u>United States</u>, 398 U.S. 333, 340 (1970) (holding that an applicant whose beliefs "are purely ethical or moral in source and content" is "as much entitled to a 'religious' conscientious objector exemption . . . as is someone who derives his conscientious opposition to war from traditional religious convictions"); <u>Rogowskyj</u> v. <u>Conway</u>, No. 06-1930, 2007 WL 779390, at *4 (D.D.C. Mar. 13, 2007) (holding regulation applicable "[w]hen, as here, an applicant does not claim adherence to a traditional religion"). The Army's reading would obliterate the distinction between objectors asserting purely moral or ethical grounds and those whose objection is based on traditional religious convictions and would render the

-23-

regulation nonsensical.[7]

The dissent acknowledges Hanna's religious convictions but argues that her objection to war cannot be religious because "pacifist views are not part of her church's doctrine." It is well settled that membership in a church that does not teach conscientious objection does not render an applicant's beliefs non-religious. United States v. Seeger, 380 U.S. 163, 171-72 (1965). An applicant's objection may be religious though she belongs to no church at all, or an applicant may "through religious reading reach a conviction against participation in war" though she belongs to a church that is not opposed to war. Id. See also Clay v. United States, 403 U.S. 698, 702-03 (1971) (holding applicant's objection sincere where based on "tenets of the Muslim religion as he understands them") (emphasis added). In Bates v. Commander, First Coast Guard Dist., 413 F.2d 475, 479-80 (1st Cir. 1969), we rejected the military's argument that the applicant's opposition to war was derived from a secular "personal code" simply because conscientious objection was not an essential tenet of his religious faith. Noting that the applicant's religious belief was "amply documented" and that the applicant identified as his religious faith a "social

_____

[7] The distinction between religious beliefs and purely moral or ethical beliefs appears elsewhere in the regulations. See, e.g., AR 600-43, Glossary ("The term 'religious training and belief' may include solely moral or ethical beliefs"); 32 C.F.R. § 75.5(c)(2) (applicant whose objection is based on "moral and ethical beliefs" must show that beliefs are held "with the strength of traditional religious convictions").

-24-

kinship with Jesus," the Court held that "great weight must be attributed to a registrant's claim that his belief is rooted in religious faith. This is particularly compelling where there has been a finding of sincerity . . . ." Id. at 480 (citing Seeger, 380 U.S. at 184). The Army must evaluate "whether the beliefs professed by a registrant are sincerely held and whether they are, in his own scheme of things, religious." Seeger, 380 U.S. at 185. Indeed, the Army's own regulations recognize that an applicant's opposition to war may be religious in nature even though her church does not teach conscientious objection. See AR 600-43 1-5.b.; 32 C.F.R. § 75.5 (c)(iii)(d) (disagreement with tenets of church does not necessarily discredit claim, so long as objection derives "from the person's moral, ethical, or religious beliefs").

In her CO application, Hanna identified herself as Christian and Christianity as the source of her objection to war. She explained in detail her belief that Christianity required her to refrain from participation in war. The IO found, based on Hanna's testimony and the testimony and letters of several Coptic priests that knew her personally, that Hanna was a "devout member" of the Coptic Orthodox Church. He found her to be sincerely opposed to war in any form because of religious as well as moral and ethical beliefs. The fact that non-religious documentaries contributed to Hanna's view that there is a conflict between her religious faith and her military service does not mean that her beliefs are purely

ethical or moral or that they lack religious grounding.  As Hanna explained in her CO application, the documentaries caused her to "view all war from a Christian perspective: complete separation from God."  Indeed, the DACORB did not question Hanna's religious belief. The President acknowledged that Hanna is a "devout Coptic Christian," and the Chaplain thought that "there is more to Cpt. Hanna's position than merely religious conviction."

Thus the Army's citation of <u>Aguayo</u> v. <u>Harvey</u>, 476 F.3d 971, 980-81 (D.C. Cir. 2007), is inapposite.  There the court upheld a denial of CO status where the applicant's beliefs did not have a religious foundation and the applicant had failed to identify the source of his non-religious objection to war.  <u>Id.</u> at 980-81.  The court reasoned that the applicant had failed to show that his ethical objection to war had developed through activity comparable in rigor to the processes by which religious convictions are formed. <u>Id.</u>  Here, because Hanna's objection to war stems from religious convictions, the regulation provides no basis in fact for the Army's decision to deny Hanna's application.[8]

---

[8] The dissent characterizes Hanna's "religious training and belief" as comprising merely "a few films, a rally, a television program."  This description simply ignores the uncontested evidence of Hanna's lifelong membership in the Coptic Orthodox Church.  The Army may not rely upon what it views as the least compelling events contributing to the development of an applicant's beliefs while ignoring a lifetime of religious observance.  "Sincerity is determined by an impartial evaluation of the applicant's thinking and living in its totality, past and present."  AR 600-43 1-5.a(5)(a); 32 C.F.R. § 75.5(c)(2).

### III.  REMAND

Finally, the Army argues that even if we find that there is no factual basis for the DACORB's decision, we must remand to the DACORB for additional proceedings.  Because the Army raised this argument for the first time in its reply brief, the issue is waived. Waste Management Holdings, Inc. v. Mowbray, 208 F.3d 288, 299 (1st Cir. 2000)(stating that "[w]e have held, with a regularity bordering on the monotonous, that issues advanced for the first time in an appellant's reply brief are deemed waived").

Even if there were some reason why this appeal should escape this settled principle (and we discern none), remand would not be appropriate.  The DACORB's denial of Hanna's application is not "flawed by mistaken legal premises, unsustainable subsidiary findings, or doubtful reasoning."  See Castanedo-Castillo v. Gonzales, 488 F.3d 17, 25 (1st Cir. 2007).  Nor is this a case of procedural defect as reflected in the cases cited in the Army's reply brief.  See Friedberg v. Resor, 453 F.2d 935, 938 (2d Cir. 1971) (remanding without reaching merits where Board failed to observe military regulations in reviewing application); Coates v. Laird, 494 F.2d 709, 712 (4th Cir. 1974) (remanding where military failed to state reasons for its decision, as required by regulations); Sanger v. Seamans, 507 F.2d 814, 819 (9th Cir. 1974) (remanding where document on which Secretary relied in reaching decision was missing from record).  Remand is improper where, as

-27-

here, there are no procedural defects, "[a hearing] has already taken place with a finding favorable to [the applicant] and the record reveals no other possible basis for a finding of insincerity." Goldstein v. Middendorf, 535 F.2d 1339, 1345 (1st Cir. 1976). See also Coates, 494 F.2d at 712 (stating that remand is not appropriate where "the record shows that there is 'no basis in fact' for denial on any valid ground").

**CONCLUSION**

For the reasons stated we affirm the judgment of the district court.

**Affirmed**.


**-Dissenting Opinion Follows-**

**BOUDIN, Chief Judge, dissenting.** On its facts, this is a close case. In the first instance the army could probably have turned down Hanna's application without much risk of reversal; but the administrative proceedings, including the investigating officer's initial decision, has weakened the army's position. So the main concern is not with the outcome but with the possible effect of the panel majority's legal rulings and analysis on future cases.

Hanna joined the army in 1997 under the Health Professional Scholarship Program, which funds an applicant's medical education in exchange for a commitment to serve in the armed forces. In this process, she expressly averred that she was not a conscientious objector. Hanna completed medical school in 2002 and received a deferral from the army to complete her training in anesthesiology. In October 2005 she received a notice from the army stating that she would be required to report for active duty in August 2006.

In response, Hanna submitted her CO application, describing the development of her pacifist beliefs. They included her religious upbringing in the Coptic Orthodox Church, the rekindling of her beliefs after the death of her father, her viewing war documentaries in the summer of 2005, her attendance at an anti-war rally in September 2005 and her viewing (in early

October 2005) a PBS program in which a man cited the Beatitudes in the context of discussing the destructiveness of war.

The army was entitled to be suspicious. The critical question in conscientious objector cases is not whether one dislikes war or prefers not to serve. To qualify for a CO discharge, Hanna had to show, by clear and convincing evidence, that she is conscientiously opposed to participation in war in any form, that her opposition is founded on religious training and beliefs,[9] and that her position is firm, fixed, sincere and deeply held. DOD Instruction 1300.06 ¶ 5.1 (formerly codified at 32 C.F.R. § 75.5(a)); A.R. 600-43 ¶ 1-7(c).

Pacifism is not a precept of the Coptic Church; based on Hanna's own evidence, the development of her position could not easily be described as reflecting rigorous study; and, although the convenient timing is not under army regulations enough to doom her application, the timing could certainly be considered together with other evidence. An army chaplain and an army psychiatrist who initially interviewed Hanna recommended against the granting of her application (although arguably they went beyond their brief).

---

[9]The army regulations define "religious training and beliefs" broadly to encompass "a sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of another, or, in the case of deeply held moral or ethical beliefs, a belief held with the strength and devotion of traditional religious convictions." A.R. 600-43, Glossary.

At the hearing conducted by the appointed investigating officer, several priests and Hanna's medical colleagues attested to her honesty and sincerity. The investigating officer found that she met the requirements for conscientious objector status. And, officers up the chain of command approved his recommendation (on the papers) until the case reached the final administrative stage: the Department of Army Conscientious Objector Review Board ("the board"), the three-person review panel ultimately responsible for reviewing CO requests.

The board (by a 2-to-1 vote) disapproved Hanna's application. The board president (Colonel Catherine Schoonover) said that Hanna appeared devout but her objections to war lacked passion and sincerity; the chaplain member joined in the denial, relying on the timing of the application and the lack of endorsement of pacifism in Coptic Church doctrine. The board's staff judge advocate member dissented, saying that Hanna had proved her belief by a preponderance of the evidence (a misstatement of Hanna's burden of proof).

A habeas proceeding followed (Hanna was already in the army as a captain), and the district court overturned the board, ordering that Hanna be discharged as a conscientious objector but staying the decision pending review here. The panel majority now affirms the district court, pointing to the evidence in support of

Hanna's application and criticizing the decision of the two board members who voted against Hanna.

Judicial review of the board's decision is intended to be highly deferential. Witmer v. United States, 348 U.S. 375, 380-81 (1955). A court asks whether there is a "basis in fact" supporting the board's decision that Hanna did not meet the heavy burden of proof she bore, id. at 381; Hager v. Sec'y of the Air Force, 938 F.2d 1449, 1454 (1st Cir. 1991). The "basis in fact" standard has been described by Judge Friendly as the most deferential review known to the law in relation to an administrator's evaluation of evidence. United States v. Corliss, 280 F.2d 808, 810 (2d Cir.), cert. denied, 364 U.S. 884 (1960); see also Witmer, 438 U.S. at 380-81.

There was nothing wrong with the board's concern with the timing of Hanna's application. The convenience of an applicant's eve-of-service conversion to pacifism, after an earlier explicit assertion to the contrary, may reinforce doubts.[10] As we said in Lobis v. Sec'y of the Air Force, 519 F.2d 304, 307 (1st Cir. 1975), "[t]his court might nonetheless give substantial weight to the

---

[10]See Lobis v. Sec'y of the Air Force, 519 F.2d 304, 307 (1st Cir. 1975) ("[T]he sudden crystallizing of CO convictions upon receipt of an induction order or call to active duty may legitimately engender suspicion."); see also Alhassan v. Hagee, 424 F.3d 518, 523 (7th Cir. 2005) ("[W]e have found that 'a belated conscientious objector application following assignment is a proper element for consideration.'" (quoting United States ex rel. Okerlund v. Laird, 473 F.2d 1286, 1289 (7th Cir. 1973))).

-32-

element of timing were it reinforced by other evidence." Any parent whose child claims to be sick on the morning of the final exam knows better than to take such a claim at face value.

Nor has the army misread its own regulations--a matter within its ken, see Beaver Plant Operations, Inc. v. Herman, 223 F.3d 25, 29 (1st Cir. 2000)--by stressing the lack of "rigor and dedication" in relation to Hanna's formation of pacifist views. The panel majority says that this language only applies if the pacifist views are "secular"; but while Hanna is religious, her pacifist views are not part of her church's doctrine; they are, assuming her sincerity, part of her own personally conceived moral framework rather than the received tenets of her religion.

In any event, the same requirement of commitment is explicit in the CO regulations that require "a firm, fixed and sincere objection to participation in war in any form" by reason either of "religious training and belief" or from equivalent non-religious "moral or ethical beliefs . . . held with the strength and devotion of traditional religious convictions." Hanna's account of her conversion (a few films, a rally, the television program) is not helpful to her claim.

There is one more troubling circumstance. Hanna's application to the program expressly acknowledged that "I am not a conscientious objector." Hanna's 2005 CO application states that at the time she applied to the HPSP program in 1997 she was

experiencing religious doubt, but the HPSP application itself evinces no such doubt and instead details her intense involvement with the Coptic Church without any reference to pacifist concerns.

Perhaps the strongest evidence in Hanna's favor is the fact that the investigating officer heard her testify and credited her sincerity; but aside from the fact that the chaplain and the psychiatrist who interviewed her did not, the responsibility is ultimately that of the board.  In administrative review, the administrative law judge's views may get weight but they are not mechanically controlling even though the ALJ heard the witnesses and the reviewing body did not.[11]

If there is a weakness in the board's position, it is in the lack of a substantial explanation in a close case.  There was evidence on both sides and the consequences for Hanna were very significant; and the board was overturning its own investigating officer with one board member dissenting.  So there was perhaps good reason for a fuller explanation.  See Rizek v. SEC, 215 F.3d 157, 161 (1st Cir. 2000); Sanger v. Seamans, 507 F.2d 814, 818 (9th Cir. 1974).  Here, however, the panel majority has not sought a

---

[11]See, e.g., Haas Elec., Inc. v. NLRB, 299 F.3d 23, 28-29 (1st Cir. 2002) (noting that where review board disagrees with factual findings of the ALJ, deference is owed to the board, but appellate review is "slightly less deferential than it would be otherwise"); Martinez v. INS, 970 F.2d 973, 974 (1st Cir. 1992) (rejecting argument that board must defer to the immigration judge's findings of fact, and granting appropriate deference to the board's contrary findings); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 496 (1951).

better explanation but impermissibly made its own definitive determination.

Waiver rules, adverted to in the panel decision, have no bearing on the matter: if an explanation is insufficient to permit review, it is the court's job to remand, whether asked to do so or not. See United States ex rel. Coates v. Laird, 494 F.2d 709, 712 (4th Cir. 1974). And the idea that remands for further explanation are limited to cases of procedural error has no support in reason or precedent. As we said in an earlier case:

> If the agency decision is flawed by mistaken legal premises, unsustainable subsidiary findings, or doubtful reasoning, remanding to the give the agency an opportunity to cure the error is the ordinary course.[12]

Holmes' famous aphorism notwithstanding, it is far from clear that hard cases make bad law. Often, the problem in a hard case is a tension between existing law and what the judge feels is the "right" result. Here, doctrine gives the close calls to the army. If a judge disregards that doctrine, it is the judge and not the case that has made bad law. This decision, alas, is such an instance.

---

[12]Castaneda-Castillo v. Gonzales, 488 F.3d 17, 25 (1st Cir. 2007) (en banc); see also Sulaiman v. Gonzales, 429 F.3d 347, 350 (1st Cir. 2005) ("On a challenge to the sufficiency of an opinion, the usual remedy is remand . . . ."); Seavey v. Barnhart, 276 F.3d 1, 12 (1st Cir. 2001) ("When an agency has not considered all relevant factors in taking action, or has provided insufficient explanation for its action, the reviewing court ordinarily should remand the case to the agency.").