Filed:  March 11, 2011

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 10-6086
(8:09-cv-01597-PJM)

———————————

STEVEN LANG KANAI,

            Petitioner - Appellee,

      v.

JOHN M. MCHUGH, Secretary of the Army,

            Respondent – Appellant.

--------------------------------------

AMERICAN CIVIL LIBERTIES UNION FOUNDATION; AMERICAN FRIENDS
SERVICE COMMITTEE; CENTER ON CONSCIENCE AND WAR; AMERICAN
CIVIL LIBERTIES UNION OF MARYLAND, INCORPORATED,

            Amici Supporting Petitioner.

———————————

O R D E R

———————————

      The Court amends its opinion filed March 4, 2011, as

follows:

      On page 27, first full paragraph, line 10 -- the

spelling of the name "Kanai's" is corrected.

      On page 28, first paragraph, line 11 -- the word "not"

is deleted.

                              For the Court – By Direction

                              /s/ Patricia S. Connor
                                      Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

STEVEN LANG KANAI,

          *Petitioner-Appellee,*

        v.

JOHN M. MCHUGH, Secretary of
the Army,

          *Respondent-Appellant.*

⎫
⎬   No. 10-6086
⎭

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION; AMERICAN FRIENDS
SERVICE COMMITTEE; CENTER ON
CONSCIENCE AND WAR; AMERICAN
CIVIL LIBERTIES UNION OF
MARYLAND, INCORPORATED,

     *Amici Supporting Petitioner.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, Senior District Judge.
(8:09-cv-01597-PJM)

Argued: December 9, 2010

Decided: March 4, 2011

Before NIEMEYER, DUNCAN, and KEENAN,
Circuit Judges.

Reversed and remanded by published opinion. Judge Keenan wrote the opinion, in which Judge Niemeyer and Judge Duncan joined.

---

**COUNSEL**

**ARGUED**: Joshua Paul Waldman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Daniel Bernard Abrahams, BROWN RUDNICK, LLP, Washington, D.C., for Appellee. **ON BRIEF:** Tony West, Assistant Attorney General, Anthony J. Steinmeyer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellant. Howard A. Wolf-Rodda, BROWN RUDNICK, LLP, Washington, D.C., for Appellee. Ward B. Coe III, GALLAGHER EVELIUS & JONES LLP, Baltimore, Maryland; Deborah A. Jeon, AMERICAN CIVIL LIBERTIES UNION OF MARYLAND, Baltimore, Maryland; Vera M. Scanlon, BELDOCK LEVINE & HOFFMAN LLP, New York, New York; Deborah H. Karpatkin, New York, New York; Daniel Mach, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Washington, D.C., for Amici Curiae American Civil Liberties Union Foundation and American Civil Liberties Union of Maryland. J. E. McNeil, Daniel O'Connor, CENTER ON CONSCIENCE & WAR, Washington, D.C., for Amici Curiae American Friends Service Committee and Center on Conscience and War.

---

**OPINION**

KEENAN, Circuit Judge:

Steven L. Kanai, a cadet in his final year at the United States Military Academy at West Point, New York (West Point), sought discharge from the United States Army (the

Army) as a conscientious objector.[1] The Department of the Army Conscientious Objector Board (the Army Board) denied Kanai's application for discharge, finding that Kanai had not demonstrated sincerely-held views entitling him to be classified as a conscientious objector.

After the Army Board's decision, the Army relieved Kanai from active duty as a West Point Cadet.[2] Kanai returned to his home in Maryland, where he filed a petition for a writ of habeas corpus in the United States District Court for the District of Maryland pursuant to 28 U.S.C. § 2241. The district court granted the writ, and the Army appeals.

The Army raises two arguments on appeal. The Army first contends that the district court lacked subject-matter jurisdiction to consider Kanai's habeas corpus petition under 28 U.S.C. § 2241(a), which authorizes certain federal courts, including district courts, to issue the writ "within their respective jurisdictions." The Army alternatively argues that even if the district court had subject-matter jurisdiction to consider Kanai's petition, the district court erred in granting the writ because the record demonstrates that there was a "basis in fact" supporting the Army Board's decision. For the reasons that follow, we hold that the district court had subject-matter jurisdiction to decide the merits of Kanai's petition, but we reverse the district court's award of habeas corpus relief and remand the case to the district court for entry of an order reinstating the Army Board's decision.

---

[1]The Department of Defense, by regulation, has authorized volunteer members of the Armed Forces to apply for conscientious objector status. *See* Dep't Def. Directive 1300.06 (Aug. 20, 1971 rev.), codified at 32 C.F.R. pt. 75 (2004).

[2]The Army also granted Kanai's separate request to resign from the Army and ordered Kanai to report for active duty, enlisted status, for a period of three years. The district court enjoined the Army from enforcing this order during the pendency of Kanai's challenge to the Army Board's decision.

## I.

In our jurisdictional inquiry, we first consider the phrase "within their respective jurisdictions," as employed in § 2241(a). The complete sentence containing this phrase states, "Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions." *Id.*

Kanai contends that the phrase "within their respective jurisdictions" in § 2241(a) refers to the geographic boundaries of the particular judicial district in which a district judge sits. Kanai asserts that, therefore, the phrase directs the proper location for the filing of a habeas corpus petition, functioning as a venue provision that does not affect the district courts' subject-matter jurisdiction. In the alternative, Kanai contends that the phrase "within their respective jurisdictions" refers to the personal jurisdiction of the district courts over the custodian of a habeas petitioner and, thus, to the district courts' authority to order a custodian to produce a habeas petitioner before the court. Kanai argues that regardless which of these two interpretations of § 2241(a) is correct, the Army waived any challenge to venue or to the personal jurisdiction of the district court because the Army failed to raise such objections in the district court.

The Army responds to Kanai's waiver argument by asserting that the phrase "within their respective jurisdictions" refers to the district courts' subject-matter jurisdiction to decide the merits of habeas corpus petitions. Citing a number of cases decided before the Supreme Court's decision in *Rumsfeld v. Padilla*, 542 U.S. 426 (2004), the Army argues that this phrase in § 2241(a) limited the subject-matter jurisdiction of the Maryland district court, because Kanai did not have a commanding officer physically present in Maryland, and because there were no "meaningful contacts" between the Army and Kanai in Maryland. Because questions of subject-matter jurisdiction are not subject to waiver and may be

asserted at any time, *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006), the Army contends that its failure to object to the district court's exercise of jurisdiction is immaterial to our consideration of this issue on appeal.

The parties' arguments, therefore, present a distinct choice. If the phrase "within their respective jurisdictions" in § 2241(a) restricts the district courts' power to decide the merits of habeas corpus petitions, as the Army contends, then the Army's jurisdictional challenge may be noticed on appeal. *Arbaugh*, 546 U.S. at 514; *Brickwood Contrs., Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004) (en banc). If, instead, the phrase imposes a venue or personal jurisdiction requirement specifying where a habeas corpus petition should be filed, then the Army's failure to raise this matter in the district court has resulted in a waiver of that issue. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 480 (4th Cir. 2005); *Robert E. Lee & Co. v. Veatch*, 301 F.2d 434, 436 (4th Cir. 1961).

The purpose of the writ of habeas corpus is to free individuals from custody who are unlawfully detained. The proper respondent to a habeas corpus petition is the person who has custody over the petitioner, namely, the person with the ability to produce the petitioner before the habeas court. *See* 28 U.S.C. §§ 2242, 2243; *Padilla*, 542 U.S. at 434-35.

When a petitioner is physically detained, the custodian generally is the warden of the facility where the petitioner is confined. *Padilla*, 542 U.S. at 435. A habeas petitioner who is physically confined must name this "immediate custodian" as the habeas respondent, and must file the habeas petition in the "district of confinement." *Id.* at 446-47. In that circumstance, the "district of confinement" necessarily is the location of both the habeas petitioner and the immediate custodian.

Habeas corpus relief, however, is not limited to petitioners who are physically confined. *See Strait v. Laird*, 406 U.S. 341

(1972); *Schlanger v. Seamans*, 401 U.S. 487 (1971); *Jones v. Cunningham*, 371 U.S. 236, 243 (1963). Although the habeas statute speaks of "a prisoner" in "custody," these terms and, thus, the reach of the writ, have been construed liberally to include the situation presented here, in which a conscientious objector seeks discharge from military service. *See* 28 U.S.C. § 2241(c)(1) (habeas statute extends to individuals "in custody under or by color of the authority of the United States"); *Schlanger*, 401 U.S. at 489. Such a petitioner is considered by the law as being "in custody" because of the restraints placed on his or her liberty by the United States military. *Schlanger*, 401 U.S. at 491 n.5. The proper respondent to a service member's petition is his or her commanding officer, and the writ acts to secure the petitioner's release from military service rather than from physical detention. *See id.* at 489-91.

To date, the federal courts have not resolved precisely the question where habeas suits should be filed by petitioners who are not physically detained and, consequently, have no obvious "district of confinement." In a number of Vietnam-era cases, the Supreme Court held that the respondent commanding officer, but not necessarily the habeas petitioner, must either be physically present within the territorial jurisdiction of the district court in which the petition is filed, or be constructively "present" in the district by operation of long-arm principles. *See Strait*, 406 U.S. at 345; *Schlanger*, 401 U.S. at 491; *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 500 (1973) (overruling *Ahrens v. Clark*, 335 U.S. 188 (1948)). In these cases, however, the Supreme Court did not explicitly state whether the required presence of the custodian implicated the subject-matter jurisdiction of the district courts, or whether the presence requirement was subject to waiver by a respondent's failure to challenge the district court's jurisdiction over the custodian. Rather, the Supreme Court left unanswered the precise meaning of the phrase "within their respective jurisdictions," as set forth in § 2241(a). *See Moore v. Olson*, 368 F.3d 757, 758 (7th Cir. 2004) (discussing Supreme Court cases cited above).

Immediately before the Supreme Court's decision in *Padilla*, the Court of Appeals for the Seventh Circuit expressly answered the question whether a habeas respondent's challenge to a district court's jurisdiction is subject to waiver based on the respondent's failure to raise the issue in the district court. In its decision in *Moore v. Olson*, that court held that the phrase "within their respective jurisdictions," as set forth in § 2241(a), does not address the subject-matter jurisdiction of the courts but is a venue provision subject to waiver by a habeas respondent. *Id.* at 758.

Soon after the decision in *Moore*, the Supreme Court rendered its judgment in *Padilla*. There, the Supreme Court ordered the dismissal of a habeas petition filed in the district court for the Southern District of New York by a petitioner who was confined aboard a United States Navy brig located off the coast of South Carolina. 542 U.S. at 432, 451.

The petitioner had named as respondents President George W. Bush, Secretary of Defense Donald Rumsfeld, and the commanding officer of the Navy brig. *Id.* at 432. The government moved to dismiss the habeas petition in the district court, arguing that the commanding officer of the Navy brig was the only proper respondent, and that the district court lacked jurisdiction over this commanding officer because she was located outside the Southern District of New York. *Id.*

In a 5-4 decision, the Supreme Court reaffirmed the "immediate custodian rule" discussed above, holding that when a habeas petitioner such as Padilla is physically detained, he or she must file any habeas petition against the warden of the detention facility in the "district of confinement." *Id.* at 447. Thus, the Court agreed with the government that Padilla should have filed his habeas petition against the commanding officer of the Navy brig in the District of South Carolina, the location of the vessel on which Padilla was confined. *Id.* at 442, 451.

The Court disagreed, however, with the government's argument that the phrase "within their respective jurisdictions" addressed the authority of the district court to decide the merits of Padilla's habeas petition. *See* Oral Arg. Tr. at 7, *Padilla v. Rumsfeld*, 542 U.S. 426 (April 28, 2004). In addressing this "jurisdictional" challenge, the Court expressly stated that it was applying the term "jurisdiction" as it "is used in the habeas statute, 28 U.S.C. § 2241(a), *and not in the sense of subject-matter jurisdiction of the District Court*." *Padilla*, 542 U.S. at 434 n.7. (emphasis added.)

The Court explained that the phrase "within their respective jurisdictions" in § 2241 addresses a federal court's "jurisdiction" over the custodian of a habeas petitioner. *Id.* at 442 (citing *Braden*, 410 U.S. at 495). This statement suggests that the majority opinion was construing the phrase "within their respective jurisdictions" in § 2241 to encompass personal jurisdiction concepts. However, in a separate concurring opinion filed by Justice Kennedy and joined by Justice O'Connor, who both were members of the five-justice majority, Justice Kennedy stated that "the question of the proper location for a habeas petition is best understood as a question of personal[ ]jurisdiction or venue." *Id.* at 453 (Kennedy, J., concurring). Justice Kennedy declined to choose between these forum-based concepts, explaining that "[t]he precise question of how best to characterize the statutory direction respecting where the action must be filed need not be resolved with finality in this case." *Id.*

It is apparent, therefore, that the Supreme Court in *Padilla* directly addressed the language of § 2241(a), and rejected the government's argument that this language restricted the district courts' subject-matter jurisdiction. Moreover, this rejection of a subject-matter jurisdiction analysis and its discussion of the language of § 2241(a) explained the Court's core holding in the case, that the district court for the Southern District of New York lacked jurisdiction over Padilla's petition because the petition was not filed in a federal district that had

jurisdiction over his commanding officer. *Id.* at 442-443. Thus, although the decision in *Padilla* did not resolve the precise nature of the restriction that the language of § 2241(a) places on the filing of habeas petitions, a majority of the Supreme Court plainly rejected a subject-matter jurisdiction analysis in that case.

After the Supreme Court's decision in *Padilla*, the Court of Appeals for the Eighth Circuit was presented with the same issue regarding the jurisdictional import of the disputed language in § 2241(a). In *Mathena v. United States*, that court considered a prisoner's habeas petition that was not filed in the district where the prisoner was confined or in a district where the Bureau of Prisons had a central or regional office. 577 F.3d 943, 946 n.3 (8th Cir. 2009). Relying on the Supreme Court's decision in *Padilla*, the court concluded that the petitioner's failure to file in the district of his confinement or in a district in which the Bureau of Prisons had an administrative office did not deprive the district court of subject-matter jurisdiction. *Id.* (citing *Padilla*, 542 U.S. at 434 n.7). The court indicated that the disputed language in § 2241(a) imposes a requirement of *in personam* jurisdiction, rather than of subject-matter jurisdiction, and held that the government waived any objection to that requirement by its failure to raise the issue in the district court. *Id.*

This circuit has not yet been required to decide the exact meaning of the phrase "within their respective jurisdictions" or the waiver issue presented in this case. In *United States v. Poole*, we observed that the Supreme Court in *Padilla* had stated that the term "jurisdiction," as used in § 2241(a), "is distinct from 'the sense of subject-matter jurisdiction of the [d]istrict [c]ourt.'" 531 F.3d 263, 270 n.12 (4th Cir. 2008) (quoting *Padilla*, 542 U.S. at 434 n.7). Nevertheless, we stated that we had "no occasion . . . to delve further into the precise meaning of the term," because the question presented in *Poole* was whether the petitioner was in "custody" under the particular facts of the case. *Id.* at 271.

In this case, we also do not need to resolve the precise nature of the phrase "within their respective jurisdictions" set forth in § 2241(a), because the Supreme Court's clear rejection of a subject-matter jurisdiction analysis in *Padilla* is dispositive of the question before us. In accordance with *Padilla*, we conclude that the phrase "within their respective jurisdictions" in § 2241(a) identifies the proper location of the federal district in which a habeas petition should be filed. We need not go any further because, regardless whether the phrase at issue is better understood as a requirement of personal jurisdiction over a habeas respondent, as held in *Mathena*, or as a venue provision prescribing the particular location for the filing of a habeas petition, as determined in *Moore*, neither of these types of requirements addresses the subject-matter jurisdiction of the district courts. Thus, any challenge to habeas proceedings based on this language in § 2241(a) is waived if not timely asserted. *See Ruhrgas*, 526 U.S. at 584; *Constantine*, 411 F.3d at 480; *Robert E. Lee & Co.*, 301 F.2d at 436; *Mathena*, 577 F.3d at 946 n.3. Accordingly, we hold that in the present case, the Army waived any objection to Kanai's petition being considered by the district court for the District of Maryland based on the Army's failure to raise the issue before the district court.

## II.

Because the Army waived its challenge under § 2241(a) to the district court's consideration of Kanai's petition, we turn to consider the merits of the Army's appeal, namely, whether the Army Board had a basis in fact to deny Kanai's application for discharge from the Army based on conscientious objector status. We consider this issue in the context of the established procedures and standards for proving conscientious objector status that are set forth in Army regulations.

## A.

Members of the Armed Services who can demonstrate a sincerely-held opposition to all wars, known as conscientious

objection, may refuse to perform military service on that ground. *See Parisi v. Davidson*, 405 U.S. 34, 38 n.2 (1972); Dep't Def. Directive 1300.06 ¶ 3.1 (May 31, 2007 rev.) The burden to establish conscientious objector status rests with the applicant, who must show by clear and convincing evidence that he or she is conscientiously opposed to participation in all wars, that the opposition is based on religious training or belief, and that these views are firm, fixed, and sincerely and deeply held. Dep't Def. Directive 1300.06 ¶¶ 3.1, 5.3; Army Reg. 600-43 ¶ 1-5.c. Applications based solely on policy, pragmatism, or expediency do not meet this standard and will be denied. Army Reg. 600-43 ¶ 1-5.a(3).

The most important of these considerations is the sincerity of the applicant's opposition to war, which is determined by an "impartial evaluation of each [applicant's] thinking and living in totality, past and present." Army Reg. 600-43 ¶ 1-5.a(5)(a). An applicant's sincere desire to separate from the military is not conscientious objection, and neither is an applicant's call to another profession, even a religious one. Army Reg. 600-43, App'x D-4(b). Factors relevant to assessing sincerity include:

> training in the home and church; general demeanor and pattern of conduct; participation in religious activities; whether ethical or moral convictions were gained through training, study, contemplation, or other activity comparable in rigor and dedication to the process by which traditional religious convictions are formulated, and the credibility of the persons supporting the claim.

Army Reg. 600-43 ¶ 1-5.a(5)(b). The conduct of the applicant, in particular his or her "outward manifestation of the beliefs asserted," is given substantial weight. Army Reg. 600-43 ¶ 1-5.a(5)(a).

The Army regulations expressly recognize that in some cases, applicants for conscientious objector status may have

sought release from the Army through several means in rapid succession, or may have applied for conscientious objector status shortly after becoming aware of the prospect of an undesirable duty assignment. Army Reg. 600-43 ¶ 1-5.a(5)(c). However, the timing of an application, standing alone, does not furnish a basis in fact to support the disapproval of an application. *Id.* The regulation provides that these circumstances merely should prompt additional inquiry into an applicant's motives. *Id.*

When a member of the military submits an application for conscientious objector status, the filing triggers a mandatory review process. The applicant is interviewed by a military chaplain and generally undergoes a mental status evaluation. Army Reg. 600-43 ¶ 2-3.

In addition, a military officer outside the applicant's chain of command is appointed to oversee the review procedures. Army Reg. 600-43 ¶¶ 2-4, 2-5. This investigating officer presides over a hearing, at which the applicant is permitted to present evidence, and issues a report of the hearing and a written recommendation on the application. Army Reg. 600-43 ¶ 2-5. The investigating officer then forwards the entire record to officers in the applicant's immediate chain of command. Army Reg. 600-43 ¶ 2-6.c. Each of these officers evaluates the application and issues a recommendation whether conscientious objector status is established. Army Reg. 600-43 ¶¶ 2-6.a(1)(a), 2-6.c. The applicant later is permitted to submit a written rebuttal statement for the record. Army Reg. 600-43 ¶ 2-5.m.

Finally, a five-member panel, the Army Board, reviews the record and makes a final decision on the application.[3] Army

---

[3]The Army Board historically was composed of three members. In July 2008, however, the Board was increased to five members. In the habeas proceeding below, the district court expressly rejected Kanai's allegation that the size of the Army Board was changed to affect the outcome of

Reg. 600-43 ¶ 2-8.a. The Army Board must articulate on the record its reasons for denying an applicant conscientious objector status. Army Reg. 600-43 ¶ 2-8.d(1),(3).

An applicant for discharge based on conscientious objector status may seek review of an adverse decision of the Army Board by filing a petition for a writ of habeas corpus. *See Strait*, 406 U.S. at 341; *United States v. Clifford*, 409 F.2d 700, 705-06 (4th Cir. 1969). In its review, the district court must ascertain whether there was a "basis in fact" for the Army Board's decision. *See Estep v. United States*, 327 U.S. 114, 122 (1946). This standard of review is extremely deferential, even more so than a substantial evidence review or a clear error review. In fact, this Court has characterized "basis in fact" review as the "narrowest known to the law." *See Blalock v. United States*, 247 F.2d 615, 619 (4th Cir. 1957).

Under "basis in fact" review, if "conflicting inferences can be drawn from the same evidence, there is a basis in fact," and the Army Board's decision is final. *United States v. Pritchard*, 413 F.2d 663, 666 (4th Cir. 1969). The Army Board's decision must be grounded in logic, and mere suspicion of an applicant's insincerity does not constitute a basis in fact for the denial of an application. *See Hanna v. Sec'y of the Army*, 513 F.3d 4, 12 (1st Cir. 2008). However, unless the Army Board acted so contrary to its own regulations that it exceeded its jurisdiction, the Army Board's decision must be upheld. *Id.* A reviewing court may not weigh the evidence or substitute its judgment for that of the military. *See Estep*, 327 U.S. at 122.

---

Kanai's particular petition. Kanai filed a cross-appeal of this ruling, and of a ruling by a magistrate judge denying in part his motion to compel the production of certain documents by the Army. On May 10, 2010, we granted Kanai's motion to voluntarily dismiss these claims pursuant to Federal Rule of Appellate Procedure 42(b).

Our review of the district court's grant of habeas corpus relief is de novo. *See Frazer v. South Carolina*, 430 F.3d 696, 703 (4th Cir. 2005). Thus, like the district court, we determine only whether there is a basis in fact supporting the denial of Kanai's application for discharge under conscientious objector status. *Estep*, 327 U.S. at 122.

B.

The following facts relevant to our review are drawn from the administrative record. In June 2004, Kanai enrolled at West Point. In exchange for receiving a tuition-free education, Kanai agreed to serve at least five years of active duty in the Army after graduating from West Point. *See* 10 U.S.C. § 4348.

In his application for admission to West Point, Kanai described his long-standing desire to serve in the Armed Services. This commitment to military service, however, began to wane during Kanai's first years at West Point. After his first year, Kanai attended a Buddhist retreat and began meditating and practicing vegetarianism. He abandoned his vegetarian practices about two years later, because the limited dietary options available to him at West Point made it difficult for him to meet the rigorous demands of cadet training.

At the beginning of his final year, Kanai began to voice opposition to the wars in Iraq and Afghanistan, and to express general doubts about his ability to serve in the military. Kanai approached his Tactical Officer, Major Jeffrey Van Antwerp, to discuss resigning from the Army. Shortly thereafter, however, Kanai told Major Van Antwerp that he had changed his mind and would remain at West Point.

A few months later, in November 2007, the Army assigned cadets in their final year at West Point to a specialty branch of the Army. Kanai was ordered to join the armor division. When he received this commission, Kanai decided that he

would prefer to serve in the infantry division. Major Van Antwerp accommodated Kanai's wishes by arranging for an additional infantry slot for Kanai. In return, Kanai agreed to serve an additional three years of active duty, for a total of eight years, upon his graduation from West Point.

Just one month later, in December 2007, Kanai sought to avoid this additional obligation. Kanai approached Major Van Antwerp to discuss Kanai's concerns that his girlfriend did not want him to serve the additional three years of active duty. At this time, Major Van Antwerp informed Kanai that the service contract could not be revoked.

About four months later, Kanai again told Major Van Antwerp that he wanted to resign. Major Van Antwerp and Kanai have conflicting recollections of this encounter. In a rebuttal memorandum in the record, Kanai stated that he did not discuss his conscientious objector views with Major Van Antwerp during this meeting because Kanai believed that Major Van Antwerp would find them offensive. According to Kanai's statement, when he told Major Van Antwerp that he wanted to resign, Major Van Antwerp asked what Kanai would do after resigning. Kanai recounted that he told Major Van Antwerp that he would pursue his interests in journalism and photography or, perhaps, would join the Peace Corps.

Major Van Antwerp also submitted a memorandum as part of the review proceedings.[4] Major Van Antwerp recalled that when he asked Kanai why he wanted to resign from the Army, Kanai responded that he wanted to resign in order to pursue his interests in journalism and photography, and

---

[4]Kanai alleges that certain procedural irregularities compromised the integrity of his conscientious objector proceedings. Among them, Kanai asserts that Major Van Antwerp improperly supplemented the record with this memorandum after the investigating officer had completed his report. Notably, however, Kanai was able to include in his rebuttal for the record a response to Major Van Antwerp's statements. Therefore, we find no merit in this allegation.

because the Army would not allow him to use this "creative side." In Major Van Antwerp's view, Kanai was attempting to leave the military because of these outside interests.

On May 12, 2008, Kanai submitted to the Army an unqualified memorandum of resignation. Kanai explained in his statement of resignation that his personal values had evolved since his entry into West Point and had become "incompatible with the lifestyle and culture of the military." In describing his values, Kanai stated, "[C]onflicts between the peoples of the world should be resolved without resorting to war." Kanai acknowledged that his resignation would trigger the reimbursement provision of his service contract, meaning that he would be responsible to repay to the Army the cost of his education. He nonetheless concluded, "I cannot accept a commission and become a leader in the Army either in a combat o[r] non-combat role." Kanai did not label himself as a conscientious objector in this document.

One week later, Kanai submitted an application for conscientious objector status.[5] In his supporting documents, Kanai elaborated on the views that he first had expressed in the resignation memorandum. Kanai explained that since arriving at West Point, he had practiced Buddhism and had studied the works of writer-philosophers including Emerson, Thoreau, and Hesse. Kanai thought that all these men "cherish[ed] the gift of life." Kanai wrote that his Christian and Buddhist beliefs, together with these studies, led him to conclude in his

---

[5]The Staff Judge Advocate recommended to the Superintendent of West Point, Lieutenant General Hagenbeck, that Kanai's resignation request be held in abeyance pending the outcome of his application for discharge. Nonetheless, on May 23, 2008, before Kanai's conscientious objector proceeding was completed, Hagenbeck recommended that Kanai's resignation be approved and that Kanai be ordered to serve three years of active duty in the Army Reserve, enlisted grade. The Superintendent holds a superior rank to the officers in Kanai's chain of command who reviewed his application for discharge but does not have authority over the members of the Army Board.

last two semesters at West Point that all conflicts must be resolved without violence. He stated that violence is justified only if his own life or the lives of his family members are threatened.

Kanai also described certain lifestyle changes that he believed outwardly manifested his conscientious objector views. He stated that he attended church several times each week, and that he routinely shared his opinions on conflict resolution with his classmates. Kanai believed that his thoughtfulness and compassion, evidenced by his daily inter-actions with others, best demonstrated the sincerity of his pac-ifist beliefs. Finally, Kanai wrote that he wanted to join the Peace Corps to effect "positive change," by documenting humanitarian crises through writing and photography.

Along with his personal statement, Kanai submitted charac-ter references from certain professors, classmates, and friends. These individuals uniformly described Kanai as honest, genu-ine, and forthright. One cadet stated that Kanai held beliefs that do not "mesh very well with the current political and tac-tical situation in Iraq or Afghanistan." This friend also wrote that, for Kanai, it was "a constant battle . . . to shape his belief system and ideals into what service in the Army would entail." An assistant professor writing on Kanai's behalf stated that, on several occasions, Kanai expressed reservations about "the current military situation in Iraq," and about his future ability to serve as an Army officer. With respect to Kanai's character, the assistant professor stated that Kanai is trustworthy and sincere, and not "given to rash decisions."

When Kanai filed his application for conscientious objector status, that filing initiated the review proceedings described above.[6] As part of this process, an Army chaplain interviewed

---

[6]The Army emphasizes the fact that civilian counsel assisted Kanai dur-ing the review process. The Army suggests that Kanai's conscientious objector views developed only after Kanai met with counsel and learned

Kanai about his professed conscientious objector views. Kanai explained to the Army chaplain Kanai's view that war is never an acceptable way to resolve problems among nations. Kanai suggested that even donning an Army uniform is an unacceptable demonstration of support for war. When pressed by the Army chaplain, Kanai could not explain why he had asked to join the infantry division, stating only that the infantry was his third "branching" preference.[7] Kanai did remember, however, that his conscientious objector beliefs crystallized after he made this branching decision and, more specifically, after he returned from spring break during his final semester at West Point.

Based on this interview, the Army chaplain concluded that the only concrete indication that Kanai held conscientious objector beliefs was the "fact that [Kanai] is a gentle person." In a memorandum for the record, the Army chaplain noted that Kanai's purported conscientious objector views were inconsistent with his request to join the infantry division. The Army chaplain also commented that conscientious objector beliefs had never prevented Kanai from participating in combat or firearms training which, according to the Army chaplain, Kanai regarded as "games" designed to impart leadership lessons to the cadets. Ultimately, the Army chaplain concluded that Kanai's views were incoherent and naive.

Dale L. Henderson, a member of the West Point faculty, was assigned to Kanai's case as the investigating officer. Hen-

---

about the requirements for discharge based on conscientious objection. However, Kanai was entitled to the assistance of counsel, and we decline to attribute to Kanai's decision to hire counsel any insincere motive with respect to his application for discharge. Army Reg. 600-43 ¶ 2-5.i; *see United States v. Resor*, 439 F.2d 1249, 1252 (4th Cir. 1971); *Goldstein v. Middendorf*, 535 F.2d 1339, 1344 (1st Cir. 1976).

[7]In his written rebuttal statement, Kanai stated that his first and second choices were the intelligence division and the transportation division, noncombat branches that reflected his evolving moral beliefs.

derson conducted a hearing, considered the administrative record, and determined that Kanai's professed beliefs constituted conscientious objection.[8] Henderson thereafter concluded that Kanai's willingness to leave West Point at considerable cost to himself was compelling evidence of his sincerity.

Henderson later sent the administrative records to officers in Kanai's chain of command. All those officers recommended that Kanai's application for discharge be denied. One officer in Kanai's chain of command concluded that Kanai's application for discharge was motivated by his desire to pursue other interests, not by pacifist views. A second officer in Kanai's chain of command noted that when Kanai approached him in May 2008 to discuss resigning from the Army, Kanai did not mention any conscientious objector views. This officer concluded that, for Kanai, the application for discharge was merely an alternative to a resignation.

A third officer in Kanai's chain of command determined that Kanai's professed conscientious objector views manifested themselves only after Kanai learned that he would be assigned to serve as an enlisted soldier if he resigned. This officer acknowledged that Kanai had some misgivings about the wars in Iraq and Afghanistan, but concluded that Kanai's conduct did not evince a moral or ethical opposition to the pursuit of those conflicts.

Finally, in the memorandum discussed above, Major Van Antwerp wrote that Kanai initially thought that he could simply resign from West Point and repay the cost of his education. Major Van Antwerp concluded that when Kanai realized

---

[8]Henderson acknowledged in his report that Major Van Antwerp doubted the sincerity of Kanai's views, but noted that Major Van Antwerp's opinions were based on one interview, while other evidence of Kanai's sincerity came from individuals who had interacted with Kanai over a longer period of time.

that he would have to serve in the Army as an enlisted solider if he resigned, Kanai educated himself about conscientious objector values and applied for discharge from the Army on that ground. Despite criticizing Kanai's motives, Major Van Antwerp stated that he liked Kanai personally and was disappointed by Kanai's "misguided" decision. All these officers' statements were provided to Kanai, and he was permitted to file a response memorandum.

After these reviews and recommendations were concluded, the Army Board considered Kanai's application, including his rebuttal statement and the full record. Each member of the Army Board issued a written recommendation on Kanai's application for discharge as a conscientious objector. Two Army Board members, a Chaplain member and a "Legal Representative" member, voted to approve Kanai's application for conscientious objector status. The three remaining members, two "Line Officers" and the Army Board's President, voted to deny the application.[9]

The first Line Officer concluded that Kanai "in no way [met] even the basic qualification for [conscientious objector] status." This Line Officer acknowledged that, for some time, Kanai had been evaluating his core values and plans for the future, but the Officer concluded that "dabbl[ing]" with other religious beliefs outside the norm did not demonstrate pacifism, or a religious conversion or religious conviction. The first Line Officer thought that Kanai presented his conscientious objector application as an "eleventh hour" attempt to

---

[9]Kanai suggests that the Army Board constructively granted his application for discharge. He explains that one Army Board member recommended that Kanai "be assigned to a non-combat [military occupation specialty]," an assignment that Kanai argues violates Army Regulation 600-43 ¶ 1-5.d. That regulation provides that an applicant denied conscientious objector "(1-0) status' may not be granted "(1-A-0) status" as a "compromise." The fact that an Army Board member may have suggested an impermissible alternative, however, does not transform a denial vote into a "constructive" vote to grant Kanai conscientious objector status.

separate from the Army. This Line Officer also stated that he agreed with the Academy Superintendent's recommendation that Kanai's resignation request be approved.

Similarly, the second Line Officer determined that Kanai had not outwardly manifested conscientious objector beliefs. This Line Officer stated that attending a Buddhist retreat and "turning vegetarian" constituted insufficient evidence to support a military discharge as a conscientious objector. The second Line Officer also identified "subtle inconsistencies" in Kanai's evidence, noting that although Kanai had proffered that his classmates would describe him as peaceful and understanding, the classmates actually had indicated that Kanai was "outspoken and perhaps confrontational" about the Iraq and Afghanistan wars. The second Line Officer also commented that Kanai participated in "aggressive" sports like boxing, rugby, and football, sports that the second Line Officer viewed as being inconsistent with an opposition to war in all forms. Like the first Line Officer, the second Line Officer concluded that Kanai merely wanted to avoid his service obligation, and did not sincerely oppose war in all forms.

Finally, the Army Board President concluded that Kanai's only outward display of his conscientious objector beliefs was an alleged increase in chapel attendance, evidence that the President characterized as uncorroborated. The President compared Kanai's application to a philosophical treatise and stated that Kanai's philosophical arguments did not demonstrate sincerity or conviction. The President concluded that Kanai's views were fickle and insincere, and that Kanai's guiding principle was his desire to leave West Point, rather than to oppose all wars.

Based on this record, the district court held that Kanai had established a prima facie case of conscientious objection, and that the Army Board members had not articulated a basis in fact supporting the denial of Kanai's application. *Kanai v. Geren*, 671 F. Supp. 2d 713, 729 (D. Md. 2009). Citing

*Peckat v. Lutz*, 451 F.2d 366, 369-70 (4th Cir. 1971), the district court opined that it was inappropriate to comb the record for a basis in fact not articulated by the Army Board members but concluded that, even if such an approach were permissible, that approach would not benefit the Army's position in this case. *Kanai*, 671 F. Supp. 2d at 720, 726-27.

The district court also denied the Army's request to remand the case to the Army Board for further consideration. *Id.* at 728-29. The district court stated that the three Army Board members who voted to deny Kanai's application for discharge were biased against Kanai, and that any remand would be futile because there was no basis in fact in the record to support the denial of his application for discharge. *Id.* at 728-29, 729 n.10.

The district court stated that the Army Board members' bias was evident in their written votes. *Id.* at 724. The district court found that the members relied on impermissible bases for their recommendations, including the timing of Kanai's application for discharge, his participation in contact sports, and the absence of any evidence of "religious conversion" by Kanai. *Id.* at 722-23, 728.

The district court also found that the Superintendent unduly influenced Kanai's commanding officers by making a recommendation on Kanai's resignation request before the officers had considered Kanai's separate application for discharge as a conscientious objector. *Id.* at 725. By doing so, the district court concluded, the Superintendent effectively ordered the officers to recommend that Kanai be denied conscientious objector status. *Id.* The district court determined that this and certain other "procedural missteps," described below, demonstrated a disregard for Kanai's constitutional right of due process. *Id.* at 718 n.3. For all these reasons, the district court held that a remand to the Army Board would be "futile," and the court granted Kanai's petition for a writ of habeas corpus. *Id.* at 728-29.

## C.

The Army argues that the Army Board had several bases in fact supporting the denial of Kanai's application for discharge, and that any one of these bases is sufficient to uphold the Army Board's decision. According to the Army, the Army Board reasonably concluded that Kanai was motivated by a pragmatic desire to separate from the Army and not by a sincere opposition to war in all forms. The Army notes that Kanai talked to his superiors about everything but conscientious objection, such as his goal to pursue interests outside the military, and his girlfriend's opposition to the additional service obligation that Kanai accepted in December 2007. The Army explains that Kanai failed to articulate what changed in his thinking between December 2007, when he requested to join the infantry division, and May 2008, when Kanai filed his application for discharge based on conscientious objection. The Army asserts that this silence about his conscientious objector views, and the absence of any outward display of those professed beliefs, belies Kanai's sincerity and is fatal to his discharge application.

The Army further contends that the supporting references submitted by Kanai speak to his character generally as peaceful, quiet, thoughtful, and honest, but have little relevance to the determination whether Kanai outwardly manifested a moral or ethical opposition to all wars. The Army asserts that Kanai's conduct demonstrated that he frequently changed his mind and, thus, calls into question whether his professed conscientious objector views were gained through training, study, and contemplation, as required by Army regulations. With respect to basis in fact review, the Army contends that even if the Army Board members relied on impermissible grounds to deny Kanai's application for discharge, this Court must uphold the Army Board's decision based on the legitimate grounds factually supported by the record.

In response to the Army's assertions, Kanai argues that there is no factual basis in the record to sustain the Army

Board's decision. Like the district court, Kanai lists the "impermissible" reasons articulated by the Army Board members who voted to deny his application, including the timing of his application, his reliance on civilian counsel, his participation in "aggressive" sports, and the "confrontational" way in which Kanai voiced opposition to the wars in Iraq and Afghanistan. Kanai contends that to the extent that the denial votes articulate other "permissible" grounds to deny him conscientious objector status, such as a lack of sincerely-held views, those grounds are stated as conclusions and do not satisfy the basis-in-fact standard. Kanai further argues that this Court may not examine the record in search of bases in fact that were not articulated by the Army Board members in their votes.

Additionally, Kanai raises various arguments challenging certain procedures employed by the Army in handling his case. He argues that the Superintendent, by releasing his recommendation on Kanai's resignation request before the conclusion of the proceedings on Kanai's discharge request, effectively "signaled" to the members of Kanai's chain of command that Kanai should be denied discharge on conscientious objector grounds.

Kanai also asserts that the Army failed to comply with its own regulations with respect to the handling of certain documents. Kanai maintains that he did not receive the denial decision in a timely manner, that his application was not processed and forwarded to the Army Board within the ninety days required by the Army Regulations, and that the statement of explanation for this delay was not added to the record for more than four months. Kanai further contends that certain documents were withheld from him, including three documents authored by the Staff Judge Advocate. These documents included an "advice" memo to the Superintendent to withhold action on Kanai's resignation request until the discharge application had been decided, a review of the legal adequacy of the conscientious objector proceedings, and an

explanation for the delay beyond ninety days in submitting the completed record to the Army Board for decision.

Finally, Kanai contends that the Army Board engaged in ex parte communications by seeking clarification from the Army regarding a particular document, which erroneously indicated that Kanai had taken the oath of office administered to West Point graduates during the pendency of his conscientious objector proceeding. Although the Army informed the Army Board of the error, the Army did not also notify Kanai of this fact.

### III.

### A.

At the outset, we observe that the evidence supports an inference that Kanai is a contemplative, self-reflective, and honest person. In considering the merits of Kanai's appeal, however, we are required to uphold the Army Board's decision if it is supported by a basis in fact. *Pritchard*, 413 F.2d at 666; *see also Bohnert v. Faulkner*, 438 F.2d 747, 751 (6th Cir. 1971); *Aguayo v. Harvey*, 476 F.3d 971, 980-81 (D.C. Cir. 2007) (conducting independent review of the administrative record to determine whether a basis in fact existed for Army Board decision). Under this very narrow standard of review, a "basis in fact" exists when conflicting inferences can be drawn from the same evidence. *Pritchard*, 413 F.2d at 666. Thus, if any inferences can be drawn from the evidence that conflict with the perspective provided by the conscientious objector applicant, there is a basis in fact to deny the application, and the Army Board's decision must be upheld. *See id.*

Here, in essence, the three Army Board members indicated that they were voting to deny Kanai's application because they thought that he merely wanted to avoid his service obligation, and that he had not presented sufficient evidence to

demonstrate a moral opposition to all wars. Although the three members' statements present conclusions, their statements also reflect the rationale underlying their votes, namely, the insufficiency of Kanai's evidence. We conclude that the evidentiary insufficiency of Kanai's application is amply supported by facts in the record.

In December 2007, just five months before Kanai sought discharge from the Army, he made an additional three-year service commitment in order to join the infantry division, rather than the armor division. Seeking out this obligation is inconsistent with any claim that Kanai held conscientious objector beliefs at that time. Moreover, when Kanai sought to avoid this additional service obligation one month later, he said nothing about holding conscientious objector views, but stated only that his girlfriend opposed the "branching" decision.

Although Kanai argues that his decision to seek an infantry assignment, with its additional three-year service commitment, occurred before his conscientious objector views "crystallized," Kanai's evidence fails to set forth how or why his views changed between December 2007 and May 2008. Nor does the record demonstrate an "outward manifestation" of conscientious objector views that would support an inference that Kanai's professed conscientious objector views emerged during this brief window of time.

Our present conclusion, that there is a basis in fact supporting the Army Board's decision, is not altered by our decision in *Peckat*. There, a service member sought discharge from the Army as a conscientious objector. *Peckat*, 451 F.2d at 367. We noted that the Army Board, in denying the application, asserted its disbelief in the applicant's sincerity but did not explain how the Army Board reached its conclusion. *Id.* at 368. We observed that we were "offered nothing but a naked conclusion of insincerity." *Id.* at 370. Rejecting this conclusion, we emphasized that "[t]he rationality of the Army's pro-

cess in arriving at its conclusions must be made manifest in the decision itself. It will not do to leave the point in a state of ambiguity until some future day when government lawyers may devise an explanatory dissertation for inclusion in a defensive brief." *Id.*

Here, however, the decision of the Army Board is not "in a state of ambiguity." The three written votes at issue made clear that each of those members based his or her decision on the conclusion that Kanai's application was motivated by his desire to separate from the Army. All three members essentially cited their view that Kanai's evidence was insufficient to establish that he was opposed to all wars. The members were not required by our decision in *Peckat* to support this reason by an analysis of the evidence presented. Instead, because their stated reason for denying Kanai's application is supported by the above-stated facts in the record, we conclude that there was a "basis in fact" for the Army Board's decision. *See Estep*, 327 U.S. at 122; *Pritchard*, 413 F.2d at 666.

Our decision also is not affected by the fact that the three Army Board members referenced various impermissible and irrelevant factors in their written votes, including Kanai's reliance on civilian counsel and his participation in "aggressive" sports. Those references are best characterized as inappropriate surplusage. The references do not negate the expressed reason for the members' decision, that Kanai had not presented sufficient evidence in support of his application.

B.

We emphasize that by deciding the merits of the Army's appeal without remanding the case to the Army Board for reprocessing, we do not adopt the district court's findings that bias and certain "procedural irregularities" in the conscientious objector proceedings deprived Kanai of his due process rights. We address each of the Army Board's purported missteps in turn.

First, the Superintendent did not issue a recommendation on Kanai's application for discharge until after the investigating officer and the commanding officers had made their own decisions. Although the Superintendent disregarded the advice of the Staff Judge Advocate to withhold action on Kanai's resignation request until after the Army Board had reached its decision on the discharge application, we disagree with the district court that this conduct improperly influenced the decision of the Army Board members, who were not subject to the Superintendent's command. In fact, the investigating officer, Henderson, who the Army concedes was under the command of the Superintendent, expressly stated that Kanai's application for discharge should be granted.

As noted earlier in our decision, Kanai's conscientious objector proceeding was not prejudiced by the late memorandum submitted by Major Van Antwerp, because Kanai was permitted to submit a written rebuttal that included a response to Van Antwerp's comments. We also conclude that the alleged errors regarding the timelines of the proceedings simply had no impact on the decision-making process. With regard to the documents purportedly withheld from Kanai, we see no reason why the documents should not have been shared with him. However, we also conclude that the documents were not relevant to the decision whether Kanai was entitled to conscientious objector status.

Additionally, we conclude that the "ex parte" communications at issue did not compromise the proceedings. If these communications had any effect, they corrected a factual error in the record that would have been harmful to Kanai's position before the Army Board. Therefore, we hold that Kanai has failed to establish that he was denied due process in the proceedings under review.

IV.

In conclusion, we hold that the district court had subject-matter jurisdiction over Kanai's habeas corpus petition, and

that the Army waived any other challenge to the district court's authority to consider the petition based on the Army's failure to raise such a challenge in the district court. We reverse the district court's judgment granting the writ of habeas corpus, and remand the case to the district court for entry of an order reinstating the decision of the Army Board.

*REVERSED AND REMANDED*